Rhenna Navajo EDWARDS, Petitioner,

v.

The STATE OF OKLAHOMA,
Respondent.

No. CIV–76–0389–D.

United States District Court,
W. D. Oklahoma.

Aug. 23, 1976.

Peter K. Schaffer, Oklahoma City, Okl., for petitioner.

Larry Derryberry, Atty. Gen. by Paul Crowe, Asst. Atty. Gen., Oklahoma City, Okl., for respondent.

## ORDER

DAUGHERTY, Chief Judge.

The above-named habeas petitioner was found guilty on March 17, 1975, after trial by the court without a jury of the crime of Operating a Motor Vehicle While Under the Influence of Intoxicating Liquor in violation of 47 O.S. § 11–902, in case No. CRM–74–3211, District Court of Oklahoma County, Oklahoma. The court then sentenced the petitioner to serve a term of six months imprisonment in the County Jail but suspended the execution of the sentence to confinement except for the first 10 days. A fine of $150.00 and the payment of court costs were also imposed. The petitioner claims that his conviction is constitutionally invalid because the trial court improperly overruled his Motion to Suppress evidence of a breathalyzer test and its results on the ground that the non-malicious destruction of the test ampoule and its contents constituted destruction of material evidence and therefore a denial of due process. State remedies have been exhausted by a direct appeal and appropriate post conviction proceedings.

At the threshold, the respondent contends that this court has no jurisdiction to entertain this action because the petitioner did not at the time the Petition herein was filed meet the "in custody" requirements of the Habeas Corpus Statute, 28 U.S.C. § 2241. It appears that after petitioner's conviction had been affirmed on direct appeal the sentence to 10 days confinement was executed but the petitioner was not immediately released because of his

inability to pay the fine imposed. On January 30, 1976, he was released on his personal recognizance upon his agreement to satisfy the fine in accordance with a payment schedule and subject to conditions of the suspended sentence.

The Petition herein was filed on May 11, 1976. The jurisdiction of the court to entertain this case must be determined by petitioner's status on that date. *Carafas v. LaVallee*, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968). When this action was commenced the petitioner was subject to reincarceration if he failed to meet the schedule for fine payments or if he violated the conditions of his probation during the unexpired term of his suspended sentence. In *Edmunds v. Won Bae Chang*, 509 F.2d 39 (CA9 1975), relied upon by respondent, the court refused to enlarge the concept of "custody" to embrace a "fine only" sentence. Similarly, in *Russel v. City of Pierre, State of South Dakota*, 530 F.2d 791 (CA8 1976), the other case cited by respondent, the sole punishment involved was the $25.00 fine and the court concluded that this was not sufficient to invoke the Habeas Corpus jurisdiction of the federal courts. The petitioner in this case, however, was subject to more than a simple fine. A petitioner who is released from jail on probation is still in custody within the meaning of the Habeas Corpus Statute. *Lebron v. United States Secretary of the Air Force*, 392 F.Supp. 219 (S.D.N.Y.1975); *Marquardt v. Gagnon*, 314 F.Supp. 709 (E.D.Wis.1970).

Cf. *Jones v. Cunningham*, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963). In *Walker v. State of North Carolina*, 262 F.Supp. 102 (W.D.N.C.1966) the court held that a 30 day suspended sentence which carried with it the threat of confinement for failure to comply with certain conditions was sufficient to establish Federal Habeas Corpus jurisdiction. Close to the facts in this case are those considered by the court in *United States ex rel Wojtycha v. Hopkins*, 517 F.2d 420 (CA3 1975). There the petitioner was sentenced to a one year suspended jail term, a fine of $1000.00 and probation conditioned upon the payment of $2500.00 cost and the court found that the statutory "in custody" requirement had been satisfied. The court concludes therefore that jurisdiction in this case does exist and the respondent's Motion to Dismiss predicated on the lack of jurisdiction will be overruled.

The determination of the merits of the controversy involves the consideration of these facts. The petitioner on November 3, 1974, was observed by an Oklahoma City Police Officer to be driving his vehicle in an erratic manner, weaving back and forth over the center line. When the officer stopped the vehicle, she detected the strong odor of alcohol on his breath. The petitioner agreed to take a breathalyzer test. It was administered by an officer licensed as a supervisor and operator of the instrument as provided by state law and the result indicated a .26% by weight of alcohol in petitioner's blood.[1] The Oklahoma Statutes

---

1. The officer explained at the pretrial hearing on the Motion to Suppress the method of administering the test as follows [Tr. on Motion to Suppress, p. 3.]:

"Q. Would you please explain briefly as you can, and I realize the instrument is complicated, the actual operating procedure that you go through when you give the breathalizer tests, as briefly as possible?

A. Okay. The instrument first is cleared with room air to make sure there is no foreign air or particles inside the instrument. This is done by using a hand pump to pump air through the instrument. This cleanses the instrument of anything that might be in it. Then a test ampule or a reference ampule is gauged and placed in the instrument. Also, the test ampule is done the same way, except when the test ampule is prepared, the top is broken off of it and it's inserted in the instrument and then hooked through a glass bubbler and a hose to the instrument itself. I might say, after checking the ampule, each ampule has a solution code number on it. These are checked to make sure this same code is used on each one. After setting the instrument up this way, then the room air is run through there again, pumped through there, then they—there is a two minute waiting period. After you let the air back through and then the instrument is checked and calibrated back to zero and the subject blows into the instrument from there and you go through the same process, two minute waiting period, the test results, whatever comes up, is registered through photo-elec-

provide that the result of such a test may be received in evidence if the test has been performed according to methods approved by the Board of Chemical Tests for Alcoholic Influence. 47 O.S.1971 § 751–759. It was stipulated at the trial that the operator had conducted the test and destroyed the test ampoule in strict compliance with the rules and regulations adopted by such Board.[2]

In urging his claims in this court the petitioner places principal reliance upon the case of *People v. Hitch*, 12 Cal.3d 641, 117 Cal.Rptr. 9, 527 P.2d 361 (1974). In considering the identical contentions made by petitioner, where the destruction of the ampoules and their contents have been accomplished by the investigative authorities in good faith and in conformity with standard law enforcement procedure, the California Court ruled that the components including the test ampoule and its contents used in the breathalyzer test constituted material evidence on the issue of defendant-driver's guilt or innocence and the State had the duty to preserve and disclose such evidence. It, however, gave the rule prospective application only, and, interestingly enough, refused even to accord its benefits to the aggrieved defendant in that case.

The Oklahoma Court of Criminal Appeals rejected the reasoning of the California court and found that the petitioner had not been denied due process. *Edwards v. State*, 544 P.2d 60 (1975). Other state courts which have had the opportunity to consider the issue have specifically refused to follow *Hitch*. In *State v. Grose*, 45 Ohio Misc. 1, 340 N.E.2d 441 (Mun. Ct. of Findlay, O., 1975) the court held that the destruction of the test ampoule after the breathalyzer test had been properly administered and analyzed by a qualified individual who was approved by the appropriate state official was not a denial of due process. In *State v. Teare*, 135 N.J.Super. 19, 342 A.2d 556, 558

(App.Div.1975) the court after reviewing the Findings of Fact and Conclusions of Law made by the trial court stated:

"Since those findings establish the preservation of the ampoule would not give any scientifically reliable information regarding the accuracy of the original test results, we hold that the State's failure to produce the ampoule does not deny defendant due process of law. The holding in *People v. Hitch*, 12 Cal.3d 641, 117 Cal.Rptr. 9, 527 P.2d 361 (Sup.Ct. 1974), essentially to the contrary, was expressly based upon a factual premise that preservation of the test ampoule would have provided evidence of value to a defendant charged with drunken driving. Since the findings here are to the opposite effect and are based on a thorough exploration of the record, we decline to follow the holding of the California Court."

This court is asked by the petitioner to conclude that it was constitutional error for the trial court not to suppress the results of his breathalyzer test. The results were clearly admissible under the rules of evidence established by the Oklahoma Statutes pertaining to chemical tests of alcohol influence. Ordinarily claims involving state rules of evidence do not rise to a constitutional level. *United States v. Augenblick*, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1968). There is no suggestion of prosecutorial misconduct. It is stipulated that the act was non-malicious and pursuant to standard law enforcement procedures. In the absence of bad faith the mere fact that the test ampoule was destroyed does not of itself amount to a constitutional violation. In *United States v. Henry*, 487 F.2d 912 (CA9 1973) the court pointed out:

"In the absence of bad faith or connivance on the part of the government, destruction of evidence prior to trial does not necessitate reversal of a conviction."

tric cells and it will show—a dial at the top and we use a little wheel to bring it in balance. When it goes back in balance, the zero is there and then the reading will show on the dial what the concentration is."

2. A copy of these Rules and Regulations submitted by petitioner in case No. CIV–76–028–D in this court which was dismissed because of failure to exhaust state remedies is hereto attached.

See also *United States v. Beathune*, 527 F.2d 696 (CA10 1975).

The Constitution does not mandate complete discovery of the prosecutor's files. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (June 24, 1976). The Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) recognized a limited right of discovery:

> "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution."

To establish a violation of the *Brady* rule the accused must show: (1) Evidence which is favorable to him; (2) Such evidence was in the possession of the prosecution at some time; (3) The evidence was suppressed and not made available to the petitioner on his request therefor; and (4) The evidence was material either to the issue of petitioner's guilt or punishment. Assuming the other requirements to be satisfied there is no showing in this case that the test ampoule and its contents were favorable to the accused. The *Hitch* court found that it sufficed that there was a "reasonable possibility" that they might constitute favorable evidence. This extension of the *Brady* Doctrine is not justified as a matter of constitutional law. *Brady* focused upon the harm to the defendant resulting from non-disclosure. *Hitch* diverts this concern from the reality of prejudice to speculation about contingent benefits to the defendant. Without regard to the culpability of the prosecution or the specific prejudice to the accused the rule would render constitutionally infirm every conviction in which there are missing items of evidence or evidence which may have been destroyed or damaged by careless or inept investigators. Historically these have been matters to be argued to the jury as perhaps raising a reasonable doubt as to the strength of the prosecution's case. As a matter of policy it may be desirable for the State to impose by statute or court rule a duty to preserve and disclose all relevant evidence but this court has no general supervisory powers over the administration of justice in the State courts. This court, however, does not believe that the Constitution makes the State the guarantor of a perfect investigation and the absolute insuror of all evidence. Mere absence of evidence of speculative value to the defendant without deliberate misconduct by the prosecution does not deprive a defendant of a fair trial. Here the results of the test and the manner in which it had been administered were provided to the defense. The expert on whom the issue depended was available for cross-examination. No more was required. The petitioner was not deprived of any constitutional right.

Moreover, if we assume that it was discovered subsequent to trial that unknown to the prosecution the test ampoule had in fact been preserved and a further test of its contents would have been favorable to the petitioner, the omission would not have constituted error of constitutional dimensions. Under such circumstances the proper standard of materiality was only recently declared by the Supreme Court in *United States v. Agurs*, supra:

> "It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed."

In this case the new evidence would only have undermined the credibility of the test results. The conviction did not rest alone upon this evidence. The review of the record discloses that the petitioner was weaving back and forth across four traffic lanes, striking the curb on several occasions. (Trial Tr. 3.) When petitioner was stopped the investigating officer "detected a very strong odor of alcohol type beverage to be emitting from his breath, from his person and the interior of the vehicle." (Trial Tr. 4.) Doubts as to the accuracy of the test would not have raised a reasonable doubt as to guilt which did not otherwise exist.

ACCORDINGLY, IT IS ORDERED:

1. That the respondent's Motion to Dismiss for lack of jurisdiction is denied.

2. That the Petition for Writ of Habeas Corpus is denied.

## APPENDIX

## RULES AND REGULATIONS

## MOTOR VEHICLES

### Board of Chemical Tests for Alcoholic Influence

The Board filed Rules and Regulations Pertaining to Breath-Alcohol Analysis Methods and Techniques adopted April 23, 1973. A photographic reproduction of said filing follows:

The Board of Chemical Tests for Alcoholic Influence, having published notice of its intention to adopt certain rules and regulations pertaining to breath-alcohol analysis methods and techniques pursuant to 47 O.S., § 759, hereby adopts the following rules and regulations, which supersede and replace the rules and regulations pertaining to performance of chemical tests for alcohol upon specimens of breath adopted by the Board on August 14, 1969:

1. Analysis of breath specimens for the determination of the alcoholic content therein by means of the Model 900 or Model 900A Breathalyzer apparatus used in association with the Model 6000 or Model Mark II Alcoholic Breath Simulator device (all of which are manufactured by the Smith & Wesson Electronics Company, Eatontown, New Jersey 07724, or its successors) is hereby declared to be a satisfactory technique or method for performance of chemical tests for alcoholic influence, and is approved as a method for chemical analysis of breath for alcohol.

(a) The procedure for each such analysis shall include the following:

(1) Continuous observation of the subject whose breath is to be tested for a period of at least fifteen (15) minutes prior to the collection of the breath specimen, during which period the subject shall not have ingested alcohol or alcoholic beverages, regurgitated, or vomited.

(2) A blank analysis.

(3) Analyses for alcohol of one or more specimens of breath which prior to collection were substantially in equilibrium with pulmonary arterial blood with respect to alcohol.

(4) Analysis for alcohol of at least one suitable reference or control sample of known alcohol concentration, such as air equilibrated at a known temperature with a reference solution of known ethyl alcohol content, results of which analysis or analyses must coincide with the corresponding blood-alcohol concentration target value within ±0.01% w/v.

(5) Performance of the above steps (2), (3), and (4) shall be in accordance with the "Operating Procedure" set forth in the Breath Analysis Record and Report, a copy of which is attached hereto marked Exhibit "A".

(6) The operator performing each such analysis shall complete the Breath Analysis Record and Report and forward one copy thereof to the Department of Public Safety, Post Office Box 11415, Oklahoma City, Oklahoma.

(b) The following maintenance shall be performed on the above listed equipment at least once during each thirty (30) day period or after every twenty-five (25) tests, whichever occurs first, by a person possessing a valid Breath Alcohol Analysis (Supervisor) Permit by this Board.

(1) A thorough inspection of the equipment for cleanliness and determination that it is in proper operating condition shall be performed.

(2) The reference ethyl alcohol solution in the alcoholic breath simulator device shall be replaced with new solution and one (1) or more verification analyses performed on the new solution. Each verification

analysis shall be performed in accordance with the approved "Operating Procedure" set forth in the Breath Analysis Record and Report, a copy of which is attached hereto marked Exhibit "A", by first conducting a blank analysis, then analysis of the reference sample; the result of any such verification analysis must coincide with the corresponding blood-alcohol concentration target value within ±0.01% W/V.

(3) Results of said verification analyses and the date of inspection shall be recorded in the maintenance log assigned to the equipment; and a written record of the inspection shall be prepared on the Technical Supervisor's Service Report, a copy of which is attached hereto marked Exhibit "B", and one copy of such written record shall be forwarded to the Department of Public Safety, Box 11415, Oklahoma City, Oklahoma 73111.

## EXHIBIT A

### BREATH ANALYSIS RECORD AND REPORT

AGENCY_____ COUNTY_____ O.H.P. DISTRICT NO._____

SUBJECT _____ SEX _____ RACE_____ D.O.B._____
    (Last)        (First)     (Middle Initial)

SUBJECT'S ADDRESS _____
              Street             City and State

ARRESTING OFFICER_____ AGENCY _____
          Name        Badge Number

IN CUSTODY _____ TESTED _____
      Date        Time (Military)      Date        Time (Military)

BREATHALYZER SERIAL NUMBER_____ SIMULATOR SERIAL NUMBER _____

#### OPERATING PROCEDURE

PREPARATION

Turn switch to "on", wait until thermometer shows 50 °C ± 3 °C. Make mechanical adjustment to galvanometer, if necessary.

BLANK ANALYSIS

1. · Turn control knob to "TAKE", gauge standard ampoule and insert in standard ampoule holder.
2. Gauge test ampoule, open, insert bubbler, place ampoule in test ampoule holder, and connect.
3. Flush out, turn control knob to "ANALYZE".
4. When red signal light appears, wait 90 seconds, turn on reading light and balance galvanometer.
5. Set scale pointer on start line.

SUBJECT ANALYSIS

6. Turn· control knob to "TAKE", collect breath sample, turn control knob to "ANALYZE", and repeat step 4.

SUBJECT'S TEST RESULT: 0._____%W/V. BLOOD ALCOHOL CONCENTRATION

BLANK ANALYSIS

7. Turn control knob to "TAKE" and repeat steps 3, 4 and 5.

REFERENCE ANALYSIS

8. Turn control knob to "TAKE", collect reference sample, turn control knob to "ANALYZE", and repeat step 4.

REFERENCE TEST RESULT: 0._____%W/V. B.A.C. SOLUTION VALUE: 0._____%W/V. B.A.C.

9. Dispose of test ampoule. Remove standard ampoule from holder, turn control knob to "OFF".

☐ ABOVE· LISTED OPERATING PROCEDURE FOLLOWED IN DETAIL.

☐ 15 MINUTE DEPRIVATION PERIOD OBSERVED (Subject's mouth was checked for improper substances and subject did not ingest any liquid or solid matter, smoke, regurgitate or vomit)

OPERATOR_____ PERMIT NUMBER _____

Pink Copy To.... *DEPARTMENT OF PUBLIC SAFETY*      White Copy To..·. *PROSECUTOR*
             *P. O. BOX 11415*
             *OKLAHOMA CITY, OKLAHOMA 73111*    Yellow Copy To... *SUBJECT*

## EXHIBIT B

[TECHNICAL SUPERVISOR'S SERVICE REPORT]

DISTRICT NO._____ DATE OF REPORT_____

BREATHALYZER SERIAL NUMBER_____ LOCATION_____
SIMULATOR SERIAL NUMBER_____ EQUIPMENT OWNED BY_____

### LOG OF TESTS

| DATE | TIME | TEST RESULT | REF. ANALYSIS | AMPOULE CONTROL NUMBER | DEPT. | COLLISION | OPERATOR PERMIT NUMBER | TEST REFUSED | REMARKS |
|------|------|-------------|---------------|------------------------|-------|-----------|------------------------|--------------|---------|
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |

### RESULTS OF SIMULATOR TESTS AFTER CHANGING SOLUTION

| DATE | LOT NO. | B.A. TEMP. | B.A. DEL. TIME | TEST NO. 1 | TEST NO. 2 | TEST NO. 3 | PERMIT NO |
|------|---------|------------|----------------|------------|------------|------------|-----------|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

MAINTENANCE PERFORMED.

_____

SIGNATURE_____

THE OKLAHOMA GAZETTE - Photographic Reproduction

PERMIT NUMBER_____
(20)