STATE of Wisconsin, Plaintiff-Appellant,

v.

Randy J. BOOTH, Defendant-Respondent.

Court of Appeals

*No. 79–1548. Argued March 28, 1980.—Decided June 10, 1980.*
(Also reported in 295 N.W.2d 194.)

For the appellant there was a brief by *Bronson C. La Follette,* attorney general, and *John W. Calhoun,* assistant attorney general, and oral argument by *Mr. Calhoun.*

For the respondent there was a brief by *Fay & Wuebben* of Pewaukee, and oral argument by *Daniel P. Fay.*

Before Voss, P.J., Brown and Bode, JJ.

BODE, J.  The State appeals the order of the circuit court suppressing the results of a breathalyzer test administered to defendant Randy Booth.  The suppression order was based upon the circuit court's finding that the ampoule used in the breathalyzer test constituted material evidence and that its destruction by the State denied defendant his constitutional right to due process of law.[1]  We agree and affirm the suppression order.

---

[1] Although the trial court and the State referred to both "materiality" and "relevancy" in their respective analyses, under the

On August 23, 1978, the defendant was arrested for operation of a motor vehicle while under the influence of an intoxicant. A breathalyzer test administered shortly thereafter indicated defendant's blood alcohol level to be 0.16 percent. On October 10, 1978, defendant filed a request for discovery specifically seeking the ampoule used in the test administered to him. On October 12, 1978, defendant moved to suppress the results of the test because the ampoule used had been destroyed immediately following administration of the test.

The breathalyzer used in the test is an electrically powered apparatus designed to calculate the extent of alcohol in the suspect's circulatory system. The suspect blows into a tube and a sample of his breath is trapped inside the machine. The trapped sample is then permitted to bubble through a glass test ampoule containing three cubic centimeters of 0.025 percent potassium dichromate in a 50-percent-by-volume sulphuric acid solution which acts as a reagent to any alcohol suspended upon the suspect's breath. If alcohol is present in the sample, it produces a change in the color and the light transmissibility of the solution. Upon the passage of a light beam through the test ampoule, the relative light transmissibility of the solution is registered on a meter which calculates the percent of alcohol in the suspect's blood.

The machine is calibrated so as to provide a reading by establishing a correlation between the test ampoule and a reference ampoule which is identical in specification. It is essential to the accuracy of the test that a quantity of exactly three cubic centimeters of the solution be present in each. This is checked by a gauge in the machine and a test ampoule not meeting the requirement is discarded. *People v. Hitch,* 12 Cal.3d 641, 644, 527 P.2d 361, 363, 117 Cal. Rptr. 9, 11 (1974).

definition of relevant evidence found in sec. 904.01, Stats., the terms are virtually synonymous. *See* Judicial Council Committee Note, 59 Wis.2d R66, R67 (1974). Hence, our use of the term "material" in this opinion is not to be construed as creating or sustaining any distinction between materiality and relevancy.

The State purchases the breathalyzer ampoules from a private manufacturer in batches of 10,000. A total of six ampoules in every 10,000 are analyzed by the State to determine if they contain the required volume and concentration of chemical solution.

An evidentiary hearing on defendant's motion was held on January 15, 1979. Both the State and defendant presented expert witnesses who testified as to the desirability of preserving the test ampoule and the feasibility of retesting the ampoule to determine if the original breathalyzer reading was accurate. Based on the expert testimony adduced, the circuit court made the following findings of fact:

(1) Retesting of an ampoule cannot recreate the evidentiary breathalyzer test results.

(2) Capping a used ampoule is not technically difficult or costly.

(3) The contents of a capped ampoule can be remeasured and can be tested to determine whether the proper chemicals were present and whether they were present in the proper concentrations and proper volume.

(4) The requisite volume of three cubic centimeters of solution in the test ampoule is essential to the accuracy of the breathalyzer test.

(5) It is always possible to determine whether or not there was a 0.025 percent potassium dichromate solution in the test ampoule.

(6) It is possible that the solution in a capped used test sample would be subject to continued chemical change with the passage of time; nevertheless, it is possible to restandardize the breathalyzer test up to 30 days after the test.[2]

---

[2] Although the circuit court impliedly imposed a thirty day period in which the request for production of the test ampoule must be made, the request in this case was not filed until forty-seven days after the test. However, at no time before the circuit court

"On review of an order suppressing evidence, the findings of fact, if any, of the trial court will be sustained unless against the great weight and clear preponderance of the evidence." *Bies v. State*, 76 Wis.2d 457, 469, 251 N.W.2d 461, 467 (1977). The aforementioned findings are amply supported by the testimony offered at the suppression hearing. Both experts agreed that the volume of the solution and the particular concentration of chemicals in the ampoule are critical to the accuracy of the breathalyzer test. If the solution is less than three cubic centimeters, the test reading will be improperly high. If a used test ampoule contains no acetic acid, that absence indicates that no ethyl alcohol (from the suspect's breath sample) passed through the breathalyzer during the test.[3] Similarly, the absence of chromium sulfate in the ampoule would mean that no reaction from alcohol had taken place.[4] Furthermore, analysis of a tested ampoule would reveal if the solution contained the required 0.025 percent potassium dichromate.

The findings that preservation of the tested ampoule would not be difficult and that the chemicals therein would remain constant long enough for reanalysis are also supported by the expert testimony. A simple capping of the test ampoule would prevent spillage and allow for relatively easy storage. Although the court noted that some chemical change may take place after

or this court has the State raised the issue of the timeliness of the discovery request. That question, therefore, is not properly before us and will not be considered in this decision.

[3] When the sulfuric acid in the ampoule solution interacts with the alcohol in the suspect's breath, the reagent divides into acids and sulfate. Although other organic materials may produce a breathalyzer reading, the absence of acetic acid would mean an absence of alcohol in the suspect's breath.

[4] The interaction of alcohol with the potassium dichromate in the ampoule produces chromium sulfate. Its absence, therefore, indicates an absence of alcohol in the test.

a period of time, the testimony supports the conclusion that restandardization of the ampoule's contents can be achieved until at least thirty days after the test.

The State does not directly challenge the validity of the findings made by the court. The basis of the appeal is that, notwithstanding the potential for restandardization of the ampoule, its routine destruction by law enforcement officers does not infringe upon any constitutional right of the defendant.

At the outset, we should note what factors are *not* involved in this appeal. There is no allegation that the destruction of the test ampoule was done in bad faith. An operational checklist provided by the Motor Vehicle Division of the Wisconsin Department of Transportation directs the officer administering the breathalyzer test to dispose of the test ampoule upon completion of the testing process. The officer who destroyed the ampoule used in the defendant's test was merely following the directions provided him. There is also no question that the scientific process of retesting or restandardization of the ampoule will not recreate the original test (*i.e.*, determine what the alcohol weight in defendant's blood was at the time of the original testing). The defendant seeks to analyze the test ampoule's contents only to determine whether it was capable of producing an accurate breathalyzer reading at the time of the test. Finally, we are not here faced with a general or ambiguous discovery request. Defendant's discovery request specifically asked for production of the ampoule used in his breathalyzer test. The ampoule was in the exclusive possession of the State at all material times prior to its destruction. It cannot be said that its existence was at any time unknown to the State or its agents. Thus, the sole question before us is whether the ampoule constitutes sufficiently material evidence to fall within the ambit of a defendant's constitutional right to due process of law. We believe it does.

The State contends that due process is infringed upon only where it is shown that the sought after evidence is favorable to a defendant. In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material to the ultimate question of guilt or innocence. The necessity of a defense showing that suppressed evidence is favorable was restated in *United States v. Agurs*, 427 U.S. 97, 109–10 (1976), where it was noted that "[t]he mere possibility that an item of undisclosed information might have helped the defense . . . does not establish 'materiality' in the constitutional sense." The State, thus, contends that because the defendant has not shown that an analysis of the ampoule's contents would be favorable to him, he has failed to show a violation of any constitutional right.

We could accept the above argument if this were a case involving *suppression* of known evidence by the prosecution. However, we are here faced with *destroyed* evidence, the favorability of which to the accused can never be determined. In the post-*Brady* decisions of the United States Supreme Court concerning a defendant's constitutional right to have access to material evidence, the content of the evidence has been known to the court and the parties.[5] Thus, the requirement of *Brady* and *Agurs* that a defendant must show the nondisclosed evidence to be exculpatory is entirely reasonable. The reasonableness of such a requirement disappears, however, where the nondisclosed evidence is destroyed. In such a situation, a different rule must apply.

The rule applicable to evidence destruction cases is that a defendant need only show the disposed of evidence

---

[5] Although *United States v. Augenblick*, 393 U.S. 348 (1969), dealt with the destruction of tapes by the government, the case was decided on an interpretation of the Jencks Act and did not reach the constitutional issues before this court.

was clearly material to the issue of guilt or innocence. This standard was first stated in *United States v. Bryant,* 439 F.2d 642, 648 (D.C. Cir. 1971), and adopted by the Wisconsin Supreme Court in *State v. Amundson,* 69 Wis.2d 554, 577–78, 230 N.W.2d 775, 788 (1975). In *Bryant,* a tape of a phone conversation between the defendant and a narcotics agent was destroyed before trial. The only direct proof of the defendant's involvement in the drug sale charged was the phone conversation. With the tape destroyed, neither the court nor the defense had any idea whether the tape would corroborate or contradict the testimony of the narcotics agent. Recognizing the impossibility of a defense showing that the tape was exculpatory, the court held that due process rights are contravened where destroyed evidence is shown to be *material* to the dispositive issue of guilt or innocence.

We have no idea what may have been on the tape. For all we know, the tape would have corroborated Agent Pope's story perfectly; or, for all we know, it might have completely undercut the government's case. . . . What we do know is that the conversations recorded on the tape were absolutely crucial to the question of appellants' guilt or innocence. That fact, coupled with the unavoidable possibility that the tape might have been significantly "favorable" to the accused, is enough to bring these cases within the constitutional concern. . . . Were *Brady* and its progeny applicable only when the exact content of the non-disclosed materials were known, the disclosure duty would be an empty promise, easily circumvented by suppression of evidence by means of destruction rather than mere failure to reveal. *United States v. Bryant, supra.*

In *State v. Amundson, supra,* at 578, 230 N.W.2d at 788, the supreme court accepted the above analysis:

We find the reasoning of the circuit court in *United States v. Bryant, supra,* persuasive. It is concluded, therefore, that the inability of the defendant to show that the destroyed evidence was exculpatory does not

alone defeat the claim that its destruction and nondisclosure by the prosecution denied the defendant due process of law given the showing that the evidence was clearly material to the issue of guilt or innocence.

Since the contents of the ampoule in this case have been destroyed, the defendant's burden is to clearly establish its materiality and not its exculpatory nature. We believe its materiality is obvious. The most common means of measuring the weight of alcohol in the blood is the breathalyzer machine. If the test indicates a level of 0.1 percent or more, the suspect is considered legally under the influence of an intoxicant. Sec. 346.-63(4), Stats. Absent an admission by the administering officer that the test was inaccurate, examination of the test ampoule and its contents appears to be the only manner in which the credibility of the test results may be challenged. "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio v. United States,* 405 U.S. 150, 154 (1972). The witness whose reliability is crucial in this instance is not the officer who administered the test. The key witness is the breathalyzer machine itself. Cross-examination of the officer can only reveal whether he correctly followed the proper procedures in operating the machine. Whether the machine was capable of correctly determining the amount of alcohol in the defendant's system can only be pursued by an analysis of the ampoule's contents.

The State cites a number of federal cases dealing with suppression and destruction of evidence in support of its contention that a defendant's constitutional rights are not prejudiced by the routine disposal of the ampoule.[6] Having examined the cases relied upon, we find

---

[6] *Killian v. United States,* 368 U.S. 231 (1961); *United States v. Love,* 482 F.2d 213 (5th Cir. 1973); *United States v. Sewar,*

them to be inapplicable to the instant case in both the factual basis and the analysis applied. None rise to the level of *United States v. Bryant, supra,* where the destroyed evidence was the sole direct evidence against the accused.

Among the cases cited by the State is *Edwards v. Oklahoma,* 429 F. Supp. 668 (W.D. Okla. 1976), in which it was held that the destruction of the breathalyzer ampoule does not deny any constitutional right. The logic employed in the *Edwards* analysis, however, is at best dubious. Characterizing the destroyed ampoule as "evidence of speculative value," the *Edwards* court concludes that the defendant's cross-examination rights are not restricted because the results of the test and the manner in which it was administered were provided to the defense. *Edwards v. Oklahoma, supra,* at 671.

We reject such reasoning. The only reason the contents of the destroyed ampoule are "speculative" is because the ampoule no longer exists. Had it been preserved, a chemical analysis could show the test results to be unreliable regardless of whether the officer who administered the test followed proper procedures to the letter. The chemical contents of an ampoule and a police officer trained to operate a breathalyzer machine are not one and the same for cross-examination purposes. To consider them so flies in the face of any meaningful right of confrontation.

Although this is a case of first impression in Wisconsin, the issue of whether the destruction of a breathalyzer ampoule warrants suppression of the test results has been considered in a number of other jurisdictions. The State readily directs this court to decisions in ten jurisdictions that have found no violation of due process in the routine disposal of test ampoules. However, our re-

468 F.2d 236 (9th Cir. 1972), *cert. denied* 410 U.S. 916 (1973); *United States v. Augello,* 451 F.2d 1167 (2nd Cir. 1971); and *United States v. Shafer,* 445 F.2d 579 (7th Cir. 1971).

view of those decisions finds them to be distinguishable from the matter before us.

In *State v. Cantu,* 116 Ariz. 356, 569 P.2d 298 (1977) ; *People v. Hedrick,* 557 P.2d 378 (Colo. 1976) ; and *People v. Stark,* 73 Mich. App. 332, 251 N.W.2d 574 (1977), the requests for production of the ampoule were made eighty-five, ninety and seventy-two days after the tests were taken. On the basis of the expert testimony (or lack thereof), in each case the request for discovery was held to be untimely. Furthermore, in *Cantu, supra,* and *Hedrick, supra,* the due process claim was denied because little or no expert testimony was offered to prove that restandardization of the ampoule's contents could yield material evidence. This same reason was relied upon in *People v. Godbout,* 42 Ill. App.3d 1001, 1 Ill. Dec. 583, 356 N.E.2d 865 (1976) ; *State v. Shutt,* 116 N.H. 495, 363 A.2d 406 (1976) ; *State v. Bryan,* 133 N.J. Super. 369, 336 A.2d 511 (1974) ; and *State v. Watson,* 48 Ohio App.2d 110, 355 N.E.2d 883 (1975). In these cases, the defendants sought suppression with virtually nothing more than a bald reliance on the case of *People v. Hitch,* 12 Cal.3d 641, 527 P.2d 361, 117 Cal. Rptr. 9 (1974), the first case to find ampoules to be material evidence subject to the disclosure rule.

In the instant case, however, substantial expert testimony was offered to show how analysis of a used test ampoule would either corroborate or refute the original test results. As previously noted, the testimony adduced at the hearing was more than sufficient to support the findings made by the court. Thus, the above decisions reaching contrary results are based more on a failure of proof by the defendants than on the application of constitutional standards.

Another case strongly relied upon by the State is *State v. Canaday,* 90 Wash.2d 808, 585 P.2d 1185 (1978). There the defendant's demand for production of the test ampoule was denied for two reasons. First, the court

concluded that the scientific principle behind restandardization of the ampoule was not sufficiently established to have gained general acceptance in the scientific community. This conclusion, however, is directly refuted by the expert testimony received at the suppression hearing. Our review of that testimony (which we deem credible) convinces us that the analysis and measurement of an ampoule's contents to determine the presence and volume of necessary chemicals is not a difficult scientific procedure. The testimony further supports the conclusion that the solution will remain in a constant state for a long enough period to allow for independent analysis by a defense expert. Thus, we do not share the doubt about the scientific principle of restandardization that was stated in *Canaday*.

The second basis for the decision in *Canaday* was a reliance on *Edwards v. Oklahoma, supra,* finding that the ampoule's contents are only "speculative" evidence, and their disposal has not been shown to subject a defendant to any "real prejudice." We have already rejected this circular approach because it effectively makes it more advantageous to the State to destroy material evidence than to preserve it and risk a court's determination of whether it is exculpatory. Such a standard imposes an insurmountable burden upon the defense and invites the use of deceptive measures by the prosecution.

Three jurisdictions that have addressed this issue, California, Alaska and Oregon, have found a duty on the part of the State as prosecutor to preserve the test ampoule for defense inspection. In *People v. Hitch, supra,* the California Supreme Court found the potential for exculpatory evidence in analysis of test ampoules sufficient to require preservation. Similarly, in *Lauderdale v. State,* 548 P.2d 376 (Alaska 1976), the court likened the analysis of an ampoule to challenge the breathalyzer result to the right to cross-examine a State

witness' credibility. Viewing each as a matter of right, the court found disclosure of the ampoule's contents to be constitutionally warranted.

In *State v. Michener*, 25 Or. App. 523, 550 P.2d 449 (1976), the Oregon Supreme Court found analysis of a used ampoule to verify the accuracy of the original test feasible up to nineteen months later. The court further recognized that cross-examination of the breathalyzer operator is insufficient where it is possible to cross-examine the reliability of the test result itself and not just the manner in which it was conducted. However, in *State v. Reaves*, 25 Or. App. 745, 550 P.2d 1403 (1976), the duty to disclose was limited to only those cases where a defendant presents evidence showing a reasonable possibility that retesting would produce a result favorable to the defense. Although we have no argument with this limitation in principle, we question whether such a limitation is feasible in all situations.

We believe that, based on the testimony received at the suppression hearing, the analysis employed and result reached in *Hitch* and *Lauderdale* should be adopted here. As previously noted, the decisions of other jurisdictions finding to the contrary are readily distinguishable. The approval of *United States v. Bryant, supra,* by our supreme court, in our opinion, mandates the result we reach today.

As a final argument, the State contends that the breathalyzer procedures required by the statutes and administrative code sufficiently protect the defendant's constitutional rights. Again, we must disagree. Although sec. 343.305(5), Stats., allows a defendant to submit to an alternative test, we do not view that right as a justification for the immediate destruction of material evidence. Furthermore, the manufacturing and operation standards set forth in Chapter M.V.D. 25 of the Wisconsin Administrative Code do not guarantee the re-

liability of breathalyzer test results. While such requirements do decrease the possibility of error, they do not eliminate it. Inadvertent error by the operator or imperfection in the manufacture of an ampoule can go completely undetected if the ampoule is routinely destroyed.

Contrary to the State's contention, we find support in the statutes for a rule requiring preservation of test ampoules. Section 345.421, Stats., allows a court to grant a defendant the right to inspect and test any "devices used to determine presence of alcohol in breath or body fluid . . . ." The test ampoule being crucial to the operation of the breathalyzer, we cannot see how access to the breathalyzer machine and not the ampoule adequately protects the rights of a defendant.

Similarly, sec. 971.23(5), Stats., provides for the production of physical evidence to allow scientific testing by the defense. Although the ampoule itself is not intended to be introduced at trial, the State obviously intends to introduce the results of the test in which the ampoule is used. We think it only reasonable, therefore, that a defendant be entitled to challenge the accuracy of the test which produced such inculpatory results.

We certainly recognize that Wisconsin's Implied Consent Law represents a strong public policy against drunken driving. Our supreme court has specifically noted its intent to "facilitate the taking of tests for intoxication and not to inhibit the ability of the state to remove drunken drivers from the highway." *Scales v. State,* 64 Wis.2d 485, 494, 219 N.W.2d 286, 292 (1974). However, we agree with the trial court that this public policy cannot justify the denial of a fair trial by allowing the destruction of material evidence.

We do not believe our decision today will impose an unreasonable burden upon the State. The expert testi-

mony adduced convinces this court that preservation of test ampoules can be accomplished without undue expense or physical problems. We view the thirty day period of preservation determined by the circuit court to be entirely reasonable to both defense and prosecution. That period allows sufficient time for defense demand and prevents the unreasonable burden that perpetual preservation would impose on law enforcement agencies.

We further note that our decision today is in no way a resolution of the merits of this case. In affirming the trial court, we only hold that the result of the breathalyzer test is constitutionally inadmissible. The State is free to continue prosecution with any other proper evidence it may have. While it is indeed unfortunate that evidence as relevant as a breathalyzer reading must be suppressed, the right to a fair trial demands such a result. As noted in *United States v. Bryant, supra,* at 648, the purpose of the State's duty to disclose is "to make of the trial a search for truth informed by all relevant material, much of which, because of imbalance in investigative resources, will be exclusively in the hands of the Government." (Footnote omitted).

*By the Court.*—Order affirmed.