[No. 4517–II.   Division Two.   March 20, 1981.]

THE STATE OF WASHINGTON, *Respondent*, v. CLIFTON H. NERISON, *Appellant*.

*Michael J. Slish,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Philip Y. Killien, Senior Deputy,* for respondent.

REED, C.J.—Defendant Clifton H. Nerison appeals his conviction for negligent homicide by motor vehicle, assigning error to the trial court's denial of his motion to dismiss the prosecution or, alternatively, to suppress testimony based on physical evidence lost by agents of the prosecutor. We affirm.

Shortly after 2 a.m. on November 18, 1978, Roxana Higgenbottom drove a borrowed Toyota automobile into a

service station on Highway 99 in Kent to purchase gasoline. She then reentered the highway, proceeding south. About 120 feet from the service station her car was struck from behind by a Ford station wagon driven by defendant Nerison. A test of a blood sample drawn from defendant approximately 2 1/2 hours after the accident showed a .23 percent blood alcohol level. The next day a passenger in the Toyota died from injuries suffered in the accident and, as a result, defendant was charged with negligent homicide by motor vehicle. RCW 46.61.520.

The trial produced conflicting testimony concerning whether the Toyota's lights were on when the accident occurred. The service station attendant, who witnessed the accident, testified that he noticed defendant's station wagon as it passed the service station and saw the station wagon's taillights until the moment of impact. After Ms. Higgenbottom paid for the gasoline, however, the attendant did not see the Toyota again until he ran out to investigate what had happened. When he arrived at the accident scene he discovered the Toyota parked in the center turn lane facing north with its lights off. Ms. Higgenbottom testified that the Toyota's lights were on when the accident occurred. She explained that, fearing an explosion, she turned off the lights and ignition immediately after the accident. Defendant testified that he never saw the Toyota, alleging that Ms. Higgenbottom must have reentered the highway without switching on her car's lights.

Accompanied by a Kent police officer, a private accident investigator retained by the prosecutor investigated the Toyota's rear lighting system about a week after the accident. For several minutes the investigator examined the only taillight filament remaining intact after the accident. He then removed it and placed it on the hood of another car to photograph it. After leaving for a few moments to get a camera, the investigator and the officer discovered the filament had disappeared from its support post inside the remains of the bulb. They were unable to find the filament despite an extended search.

The trial court denied a pretrial motion either to dismiss the case or to exclude all evidence related to the filament. Over the objection of defense counsel at trial, the court permitted the investigator to testify that, based on his examination of the filament, the Toyota's taillights definitely were on when the accident occurred. The jury found defendant guilty of negligent homicide.

Relying on *State v. Wright,* 87 Wn.2d 783, 557 P.2d 1 (1976), defendant argues that because he conceivably could have used the filament to show the accident would have occurred even had he been sober, the loss of the filament constituted a due process violation. He contends there is a reasonable possibility an independent examination of the filament would have supported his defense that his intoxication was not a proximate cause of the accident, an essential element of negligent homicide by motor vehicle. *See State v. Engstrom,* 79 Wn.2d 469, 487 P.2d 205 (1971); *State v. Fateley,* 18 Wn. App. 99, 566 P.2d 959 (1977); *State v. Mearns,* 7 Wn. App. 818, 502 P.2d 1228 (1972).[1]

We feel compelled to reject defendant's argument and affirm his conviction in light of the analysis employed by the Washington Supreme Court in *State v. Canaday,* 90 Wn.2d 808, 585 P.2d 1185 (1978), and *State v. Gilcrist,* 91 Wn.2d 603, 590 P.2d 809 (1979). As discussed in greater detail below, however, we believe the *Canaday–Gilcrist* analysis should be reconsidered.

In *Wright* the Supreme Court reversed a first degree murder conviction and dismissed the charges against the defendant because the police had destroyed several items of physical evidence prior to trial. Recognizing that loss or destruction of items of evidence makes it impossible for a

---

[1]Although contributory negligence is no defense to negligent homicide, *State v. McDaniels,* 30 Wn.2d 76, 89, 190 P.2d 705 (1948), evidence of contributory negligence may be material to whether the defendant's negligence was a proximate cause of the death or whether the defendant was negligent at all. *State v. Ramser,* 17 Wn.2d 581, 590, 136 P.2d 1013 (1943); WPIC 25.03, 11 Wash. Prac., Comment (1977); 40 Am. Jur. 2d *Homicide* § 113 (1968). *But see State v. Carlsten,* 17 Wn.2d 573, 576–77, 136 P.2d 183 (1943).

court to determine with any certainty whether the evidence would have been helpful to the defendant, the court, relying on *United States v. Bryant,* 439 F.2d 642 (D.C. Cir. 1971), and *People v. Hitch,* 12 Cal. 3d 641, 527 P.2d 361, 117 Cal. Rptr. 9 (1974), held that destroyed evidence will invoke sanctions against the prosecution under the due process clause when there is a *reasonable possibility* the evidence was material to guilt or innocence and favorable to the defendant. 87 Wn.2d at 788–90. After reviewing the entire record, the court concluded that the defendant had satisfied this standard by enumerating 9 areas "where the existence of the evidence destroyed could possibly have been of assistance to him". *Id.* at 790, 557 P.2d at 6. Because the evidence had been destroyed, the defendant could only speculate what it might have revealed.

In *Canaday,* the defendants, citing *Wright,* brought a due process challenge to the routine destruction of Breathalyzer test ampoules by police officers. One of the defendants' arguments was that the ampoule might show the testing officer failed to inspect the defendants' mouths for food before administering the test or might show the ampoules did not conform to certain critical size specifications. 90 Wn.2d at 815–16. Either showing would undermine the validity of the test results but would not provide affirmative evidence of innocence.

The court held that the defendants were not denied due process by the destruction of the ampoule. Applying a test of materiality of nondisclosed evidence first enunciated in *United States v. Agurs,* 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976), the *Canaday* court concluded that the proposed use of the ampoules was not "a means of raising a reasonable doubt which did not otherwise exist". 90 Wn.2d at 815–16. The court reasoned that the testing officer could be cross-examined regarding the care taken at each step in the testing procedure and that the defendants had adequate opportunity at trial to impeach the credibility of the officer without access to the used ampoule. *Id.* at 816, 588

P.2d at 1189. The court also relied on *Edwards v. Oklahoma*, 429 F. Supp. 668 (W.D. Okla. 1976), to conclude that

> [m]ateriality within the scope of constitutional protection is determined not by speculation about whether the evidence may possibly yield favorable evidence at trial, but rather by the reality of the prejudice to the defendant caused by nondisclosure.

90 Wn.2d at 816.

In *Gilcrist* the defendants appealed their conviction for first degree assault arising out of an incident in which a fellow prison inmate was stabbed some 31 times. A prison guard who witnessed the stabbing identified the defendants as the assailants, although no weapons were found in their possession in a search shortly after the incident. The day after the stabbing, a correctional officer, while looking for evidence, noticed a hair in a blood smear on a wall at the scene of the incident. The officer chipped off the smear from the wall and delivered it to the local police, who apparently lost it.

The court rejected the defendants' claim that the loss of the hair and blood samples violated their due process rights. To establish a due process violation, the court required the defendants to show "that the lost evidence 'was material to guilt or innocence and favorable to the appellant[s].'" *Gilcrist*, 91 Wn.2d at 609 (quoting *Wright*, 87 Wn.2d at 790). The court noted that the defendants presented little in the record to support their claim that the missing hair could point to others as the assailants or could corroborate their defense that they were not present at the assault. The court added that the missing evidence was unnecessary for a prima facie defense and, at best, could only circumstantially establish the defendants' innocence.

We read *Canaday* and *Gilcrist* as requiring the defendant to make an affirmative showing that the missing evidence (1) would have been favorable to him, and (2) would have created a reasonable doubt that did not other-

wise exist.[2] Under this analysis, we believe that defendant's claim of a due process violation must fail. First, aside from the testimony of the service station attendant who witnessed the accident, defendant has made no showing that the lost filament was favorable to him. Indeed, in view of the testimony of the investigator, we could reasonably infer that the filament probably would have been unfavorable to the defendant. Clearly, defendant can do little more than speculate that the evidence possibly might have yielded favorable evidence at trial. *State v. Canaday, supra; Edwards v. Oklahoma, supra.* Second, even if the filament had proved favorable to defendant, it is unlikely that this evidence would create a reasonable doubt that did not otherwise exist. *United States v. Agurs, supra; State v. Canaday, supra; Edwards v. Oklahoma, supra.* Defendant reasonably could hope to use the filament only to impeach the testimony of the investigator who inspected it. There

---

[2]We reach this conclusion through our study of *Edwards,* the source of the court's analysis in *Canaday.* As in *Canaday* and *Hitch,* the *Edwards* case involved a due process challenge to the routine destruction of Breathalyzer ampoules. Dismissing the defendant's claim of constitutional violation, the *Edwards* court noted that there was no showing that the ampoule and its contents were favorable to the accused. The court squarely rejected the "reasonable possibility" standard adopted in *Hitch,* arguing that the standard "is not justified as a matter of constitutional law" and diverts attention "from the reality of prejudice to speculation about contingent benefits to the defendant." *Edwards,* 429 F. Supp. at 671. The court concluded:

> Mere absence of evidence of speculative value to the defendant without deliberate misconduct by the prosecution does not deprive a defendant of a fair trial. Here the results of the test and the manner in which it had been administered were provided to the defense. The expert on whom the issue depended was available for cross–examination. No more was required.

*Id.* Finally, the court noted that even if the ampoule had been preserved and a further test of its contents proved favorable to the defendant, the new evidence only would have undermined the credibility of the test results. Because the conviction did not rest alone on these results, doubts as to the accuracy of the test "would not have raised a reasonable doubt as to guilt which did not otherwise exist." *Id.*

We note the *Edwards* case was reversed on appeal to the Tenth Circuit Court of Appeals, 577 F.2d 1119 (10th Cir. 1978). The appellate court did not directly reject the district court's analysis. It remanded for an evidentiary hearing, however, because it was "disinclined to grapple with potentially close constitutional issues until [it had] a more secure factual underpinning." *Id.* at 1121.

was abundant evidence of guilt in this case other than the investigator's testimony. Furthermore, as in *Canaday,* and *Edwards,* defendant had a full opportunity to cross–examine the investigator about his inspection of the filament and the method by which he concluded that the taillight was on when the collision occurred. Defendant made no offer of proof that having the filament would enable him to produce an expert who would testify that the Toyota's lights were off, and probably nothing short of such a showing could create a reasonable doubt that did not otherwise exist. *State v. Canaday, supra; State v. Edwards, supra; State v. Gilcrist,* 91 Wn.2d 603, 590 P.2d 809 (1979).

Although we feel compelled to apply our interpretation of the *Canaday–Gilcrist* analysis in this case, we wish to express our reservations about the reasoning underlying these recent missing evidence cases. In our view, the test enunciated in *Canaday* and *Gilcrist* places an unwarranted burden on defendants to establish that they have been prejudiced by the prosecution's loss or destruction of evidence.

First, we believe it is unreasonable to require a defendant to demonstrate that missing evidence would have been favorable to him. In cases involving the *suppression* of *known* evidence, such a requirement is perfectly proper. In cases involving the *loss or destruction* of evidence, however, a court obviously cannot determine with any certainty whether the evidence was favorable to the defendant because neither the court nor the parties have access to it. *Wright,* 87 Wn.2d at 787–88; *United States v. Miranda,* 526 F.2d 1319, 1328 (2d Cir. 1975); *Bryant,* 439 F.2d at 648; *Hitch,* 12 Cal. 3d at 647–48; *State v. Amundson,* 69 Wis. 2d 554, 577, 230 N.W.2d 775, 788 (1975). In most cases, to require an affirmative showing that the missing evidence was exculpatory places an impossible burden on the defendant. *People v. Harmes,* 38 Colo. App. 378, 560 P.2d 470 (1976); *State v. Booth,* 98 Wis. 2d 20, 26–27, 295 N.W.2d 194, 197–98 (1980). Comment, *The Prosecutor's Duty of Disclosure: From Brady to Agurs and Beyond,* 69

J. Crim. L. & Criminology 197, 222–23 (1978); 53 Wash. L. Rev. 573, 584–85 (1978).

Second, assuming that the United States Supreme Court intended the tests of "constitutional materiality" it developed in *Agurs* to apply at all in lost or destroyed evidence cases,[3] we believe the court in *Canaday* borrowed the wrong test from *Agurs*. The woman defendant in *Agurs* was convicted of second degree murder in the stabbing death of a man in a motel room. Three months after the verdict, the defense counsel discovered the prosecution had failed to provide him certain background information about the victim tending to support his argument that the defendant acted in self-defense. He filed a motion for a new trial, alleging that the prosecution had suppressed material evidence and thereby deprived his client of a fair trial under the rule of *Brady v. Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963).

The *Agurs* court explained that *Brady* problems arise in three quite different contexts: (1) where the prosecution has knowingly used perjured testimony; (2) where it has failed to honor a request for *specific* evidence; and (3) where it has failed to honor a *general* request for "*Brady*

---

[3]Direct application of rules developed in cases involving suppression of evidence may not be appropriate in cases involving loss or destruction of evidence. Although the two contexts are analogous, they also differ significantly. In a suppression case, the evidence can be analyzed easily because it is still available. Focusing exclusively on the materiality of the evidence therefore makes sense. In a loss or destruction case, however, measuring the effect the evidence might have had on the verdict is difficult or impossible because the evidence no longer exists. Consequently, determining the outcome of a case solely on the character of the evidence seems somewhat suspect. Furthermore, if evidence has been suppressed, a new trial at which the evidence is made available to the defendant provides him with an adequate remedy. If evidence has been lost or destroyed, however, fashioning an appropriate remedy is much more difficult. Because the evidence is unavailable, simply giving the defendant another trial can accomplish nothing. Thus, a court often is forced either to ignore culpable conduct by the prosecution resulting in arguable prejudice to the defendant or to dismiss criminal charges based on mere speculation about the character of missing evidence. Tests of materiality developed in suppression cases seem to be of little help in dealing with this dilemma. *See* Comment, *Judicial Response to Government Loss or Destruction of Evidence,* 39 U. Chi. L. Rev. 542, 557–58 (1972).

material" or where the defense has made no request at all. *Agurs,* 427 U.S. at 103–07. The court stated that a conviction obtained through knowing use of perjured testimony must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." (Footnote omitted.) *Id.* at 103, 49 L. Ed. 2d at 349–50. The court concluded that when the defense has made a specific request, suppressed evidence is material if it "might have affected the outcome of the trial." *Id.* at 104, 49 L. Ed. 2d at 350. In the absence of such a request, however, the court explained that the duty to disclose "must derive from the obviously exculpatory character" of the evidence. *Id.* at 107, 49 L. Ed. 2d at 351. The court reasoned that a higher standard of materiality is appropriate when the defense has failed to make a specific request because

> [i]f everything that might influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice.

*United States v. Agurs,* 427 U.S. 97, 109, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976). Thus, the court determined that in this third situation the standard of materiality should reflect no more than the concern that a finding of guilt be supported by evidence establishing guilt beyond a reasonable doubt:

> It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

(Footnote omitted.) *Id.* at 112–13, 49 L. Ed. 2d at 355.

The *Canaday* court applied the third and for the defendant the most stringent *Agurs* materiality standard to conclude that

used Breathalyzer test ampoules are not material evidence in a constitutional sense and nondisclosure of the ampoules caused by routine destruction and disposal is not constitutional error.

*State v. Canaday,* 90 Wn.2d 808, 816, 585 P.2d 1185 (1978). Because there was a defense request for specific items of evidence in *Canaday,*[4] we fail to understand why the *Canaday* court used a test of materiality that was meant to apply only in the absence of such request. Instead, the *Agurs* court's discussion of *Brady* appears to be more closely analogous to the situation in *Canaday.* The Court concluded that "[w]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *Agurs,* 427 U.S. at 106. In such circumstances, according to the *Agurs* court, the proper test of materiality is whether the suppressed evidence "might have affected the outcome of the trial." *Id.* at 104, 49 L. Ed. 2d at 350. This is a much less stringent standard than the one applied in *Canaday.*

In conclusion, *Canaday* and *Gilcrist* compel us to conclude that, because Mr. Nerison was unable to show affirmatively the missing filament would have proved the Toyota's taillights were not on, his due process challenge must fail.

Judgment affirmed.

PEARSON and PETRIE, JJ., concur.

Reconsideration denied April 21, 1981.

Review denied by Supreme Court June 12, 1981.

---

[4]In *Canaday* the defendants apparently sought pretrial discovery of the ampoule used in their tests. 90 Wn.2d at 811. Similarly, in *Gilcrist* the defendants apparently requested the blood smear after learning about it at trial. 91 Wn.2d at 608. Indeed, in most lost or destroyed evidence cases, the defendants have requested the items at or before trial.