STATE of Wisconsin, Plaintiff-Respondent,

v.

Burdette O. WALSTAD, Defendant-Appellant.†

Supreme Court

*No. 82–1864–CR. Argued November 2, 1983.—
Decided June 27, 1984.*

(Also reported in 351 N.W.2d 469.)

† Motion for reconsideration denied August 30, 1984, without costs.

484

For the defendant-appellant there were briefs by *Sarah B. O'Brien* and *Davis & O'Brien,* Madison, and oral argument by *Sarah B. O'Brien.*

For the plaintiff-respondent there were briefs by *Lauren Brown-Perry,* assistant district attorney, with whom on the brief was *Hal Harlowe,* district attorney, and *Jeffrey M. Gabrysiak,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general, and oral argument by *Mr. Gabrysiak.*

HEFFERNAN, C.J. This is an appeal, taken on certification of the court of appeals, by Burdette O. Walstad from a conviction of the circuit court for Dane county, Mark A. Frankel, Circuit Judge, on a plea of no contest to a charge of operating a motor vehicle while under the influence of an intoxicant, in violation of sec. 346.63 (1), Stats. 1979–80.

The issue posed is whether the results of a breathalyzer test should have been suppressed because the state, in accordance with the procedures then mandated by the department of transportation, destroyed the test ampoule immediately after the administration of the test. The defendant asserts that the destruction of the ampoule, which was allegedly material to a finding of guilt or innocence, and the defendant's consequent inability to examine the ampoule denied him due process of law and requires suppression of the test results and dismissal of the charge.

Because the trial court's findings and its order denying suppression were contrary to several decisions of the court of appeals and, arguably, contrary to decision of this court, we accepted the court of appeals' certification of the appeal.

We sustain the trial court's conclusion that the used test ampoule was not material evidence of the defendant's guilt or innocence, because the ampoule, had it been preserved, could not have been retested or reexamined in a manner that would provide relevant evidence either in respect to the accuracy of the original test or to the guilt or innocence of the defendant. Accordingly, we affirm the conviction.

In so doing we specifically overrule and repudiate the entire line of cases stemming from *State v. Booth*, 98 Wis. 2d 20, 295 N.W.2d 194 (Ct. App. 1980), which hold that the destruction of the breathalyzer test ampoule warrants the suppression of the test results and which rely on the theory that a used ampoule is testable to determine blood alcohol and can supply material evidence in respect to a defendant's guilt or innocence. We conclude, on the basis of the facts adduced in this record, that the ampoule and its contents are not retestable, that they cannot be the source of relevant evidence, and that their destruction—and hence the inability to do a retest—does not deny a defendant due process of law. The test results, therefore, are not suppressible. Accordingly, because the test results are not to be suppressed, we have no reason to decide the question of whether the charge against Walstad should be dismissed.

The facts on which the charge is based are substantially undisputed. The defendant was arrested on March 19, 1980, and charged with operating a motor vehicle while under the influence of an intoxicant (OMVWI), in violation of sec. 346.63(1), Stats. 1979–80. He had been convicted of another OMVWI offense during the preceding five years and, hence, was subject, upon conviction, to the criminal penalties set forth in sec. 346.65(2)(a).[1]

---

[1] Sec. 346.65(2)(a), Stats. 1979–80, provides for enhanced penalties for two or more convictions within a five-year period. Walstad

Upon arrest he submitted to a breathalyzer test, which showed a .15 + percent Blood Alcohol Content (BAC).[2]

The ampoule used in the administration of the test was destroyed by the breathalyzer operator pursuant to the instructions in the operator's checklist provided at that time by the department of transportation.

Walstad made his initial appearance without an attorney on April 9, 1980, and it was only after the appointment of an attorney that a motion was made to extend the time for discovery. On May 1, 1980, forty-three days after the breathalyzer test was performed, the defendant moved for the production of the breathalyzer ampoule. The motion was granted, but the ampoule could not be produced, because it had been destroyed as a part of the then routine procedure. The defendant then moved to suppress the test results, which had shown a BAC of .15 + percent. An evidentiary hearing was ordered by the trial judge to determine whether the BAC results should be suppressed.

The hearing held on the motion to suppress was protracted and exhaustive. After a hearing covering four days, the circuit judge denied the motion to suppress the test results. Following this determination, Walstad pleaded no contest, a judgment of conviction was entered, and an appeal was taken.[3]

was, for this reason, sentenced to one-hundred-twenty days in jail and a monetary forfeiture.

[2] Sec. 885.235(2a), Stats. 1979–80, provides:

"The concentration of alcohol in 2100 cubic centimeters of deep lung or alveolar breath shall be prima facie to be equal to the concentration of alcohol in 1 cubic centimeter of blood when equilibrium has been reached."

It is this fundamental ratio that is used to determine BAC from the quantity of alcohol in a unit of breath.

[3] It should be noted that, where a defendant pleads guilty or is found guilty on a no contest plea following an unsuccessful attempt to suppress evidence, the suppression order is reviewable upon ap-

The state on this appeal responsively argues that the motion to suppress was untimely, because it was not made within ten days, as required by sec. 345.421, Stats. 1979–80.[4]

On the other hand, it is argued by the defendant that the ampoule was also required to be produced pursuant to sec. 971.23(5), Stats. 1979–80,[5] which states that, on motion,

"[T]he court may order the production of any item of physical evidence which is intended to be introduced at the trial . . . ."

The state takes the position that the test ampoule need not be produced, because, "The ampoule was not an item which the state anticipated introducing into evidence at trial."

While we held in *City of Lodi v. Hine,* 107 Wis. 2d 118, 121, 318 N.W.2d 383 (1982), that an ampoule was producible under sec. 345.421, Stats. 1979–80, because

peal from the judgment of conviction. Sec. 809.10(4), Stats. 1979–80.

[4] "345.421 **Discovery.** Neither party is entitled to pretrial discovery except that if the defendant moves within 10 days after the alleged violation and shows cause therefor, the court may order that the defendant be allowed to inspect and test under s. 804.09 and under such conditions as the court prescribes, any devices used by the plaintiff to determine whether a violation has been committed, including without limitation, devices used to determine presence of alcohol in breath or body fluid or to measure speed, and may inspect under s. 804.09 the reports of experts relating to those devices."

[5] "Sec. 971.23 **Discovery and inspection.**

"(5) SCIENTIFIC TESTING. On motion of a party subject to s. 971.31(5), the court may order the production of any item of physical evidence which is intended to be introduced at the trial for scientific analysis under such terms and conditions as the court prescribes. The court may also order the production of reports or results of any scientific tests or experiments made by any party relating to evidence intended to be introduced at the trial."

"the breathalyzer machine is useless without the test ampoule; therefore, the ampoule is a part of the device used and, as such, is covered by the language of sec. 345.421, Stats.," we did not take this case on certification to decide whether or not the motion had been timely brought. Nor did we accept it for a determination of whether the ampoule was producible as an item of physical evidence covered by sec. 971.23 (5).

Certification was granted in this case because we shared the concern of the court of appeals that the evidence produced at the hearing in this case, and which was accepted by the trial court, eroded the factual basis on which *Booth* and its progeny were decided—that a used breathalyzer ampoule could be retested to produce evidence material to the tested subject's guilt or innocence. While the issue succinctly posed by the court of appeals in its request for certification was, "Should the results of a breathalyzer test be suppressed or the charge dismissed where the state fails to produce the test ampoule in accordance with a demand for it forty-three days after the test," the real issue stated in its request for certification was the court of appeals' concern that, "by holding that there is no scientific basis for retention of the ampoule, the trial court effectively overrules prior case law and obviates sec. 343.305 (10) (d)."[6]

---

[6] It should be noted that sec. 343.305(10)(d) did not become effective until May 1, 1982; hence, it has no direct effect upon this case. It provides:

"(d) Each breathalyzer test ampoule which has been used in the test of a person to determine the alcohol content of breath shall be preserved, subject to the following conditions:

"1. Upon the completion of the chemical analysis of the person's breath, the person shall be informed that:

"a. The test ampoule shall be preserved for a period of 30 days after the test was given.

"b. During the 30-day period, the person may request the agency employing the person who conducted the analysis to trans-

Hence, we do not decide or consider the arguments in respect to the timeliness of the defendant's motion under sec. 345.421, Stats. 1979–80.

The issue in this appeal certified to us is whether a used test ampoule is, or can be, evidence that is "material" to a defendant's guilt or innocence and, consequently, whether its nonproduction as the result of its destruction, not in bad faith, requires suppression of the test results, because to do otherwise would constitute a denial of due process. *See, Brady v. Maryland,* 373 U.S. 83 (1963); *United States v. Bryant,* 439 F2d 642 (D.C. Cir., 1971); *State v. Amundson,* 69 Wis. 2d 554, 230 N.W.2d 775 (1975).

*Booth, supra,* impliedly held that sec. 971.23(5), Stats. 1979–80, which provides that physical evidence shall, upon motion, be produced for examination, includes the right to inspect a used test ampoule, because the results based upon the use of the ampoule will be produced at trial to prove the defendant's degree of intoxication. The *Booth* court begged the question. It assumed that the used test ampoule was material when a demand was made to produce, because its materiality was "obvious." That materiality was, however, "obvious" only when the test was performed. Whether the spent ampoule had ma-

---

fer the test ampoule to an independent laboratory for preservation and testing. The person making the request shall pay a fee, set by and payable to the law enforcement authority, for the actual cost of transferring the ampoule. The person shall also pay a fee, set by the department of transportation by rule, for the cost of preserving the ampoule during all or part of the 30-day period. The fee shall be deposited in the transportation fund.

"c. If the person does not request the test ampoule preserved during the 30 days, the ampoule shall be destroyed by the agency employing the person who conducted the analysis.

"2. All forms, reports and preservation containers required to fulfill the requirements of this paragraph shall be furnished by the department."

teriality at a later date was not "obvious." The court of appeals fell into the error of concluding that the initial "obvious" materiality of the test ampoule continued for an undefined period of time.

*Booth* demonstrates, however, that the ampoule was considered to be producible on motion and its reexamination admissible on trial on the assumption—which on the facts of *Booth* appeared warranted—that the used ampoule was retestable for some protracted period of time in a manner that would produce evidence material to the defendant's guilt or innocence. If that assumption of materiality be proved incorrect, then there is no denial of due process for the inability to produce the ampoule as a consequence of its non-bad-faith destruction.

Before discussing the substance of the evidentiary hearings conducted in the instant case by the trial judge at the suppression hearings, it is appropriate to review the methodology of the breathalyzer test and the chemistry upon which it is based.

*Booth, supra,* 98 Wis. 2d at 21, relied upon the exposition in *People v. Hitch,* 12 Cal. 3d 641, 527 P.2d 361 (1974), for a synopsis of breathalyzer procedures. That outline is substantially correct, but it omits factors that are important in understanding the breathalyzer.

In supplementation of the summary appearing in *Booth,* we quote below from the Student Study Guide prepared by the Wisconsin Department of Transportation for use as a reference work in the *Basic Training Program for Breath Examiner Specialists:*[7]

---

[7] *"The Breathalyzer*

"The Breathalyzer is a scientific instrument designed to determine the exact amount of ethyl alcohol (drinking alcohol) in the breath. The amount of alcohol in the breath is in direct ratio to that in the blood.

"This determination is effected by exhaling into a tube which carries the exhaled breath into a cylinder fitted with a piston and

This explanation comports with the abbreviated summary in *Booth, supra;* the explanation found in Watts,

release valve. As the subject exhales into the tube, the piston rises to a fixed height and thus a fixed volume. At this point the release valve is actuated, the piston begins to drop, and this definite volume of trapped breath is forced into a glass tube (ampoule) containing a standard chemical reagent of a definite yellow color intensity. The ethyl alcohol in the breath sample reacts with a standard chemical reagent to produce a fading in color intensity. The faded or reacted chemical, when compared electronically with a second standard chemical reagent of the same material and thus the same original color intensity, allows us to read directly the alcohol content in the blood.

"This electronic comparison of color intensity is accomplished by situating a light directly between the two reagent tubes, and directly behind each reagent tube a photocell. When the light is on, each photocell will receive the same amount of light and thus emit the same amount of voltage. Should the sample breath cause a fading of one of the reagent tubes, the light must be moved toward the unreacted solution to compensate for this fading and maintain equal voltage. By attaching a pointer to the light carriage and relating this carriage movement to per cent blood alcohol the reading is obtained.

"*Breathalyzer Operation*

"The method consists of three principal phases. In the first, a known amount of alveolar (deep lung) breath is trapped in a cylinder. The subject blows into a tube, which raises a piston to a level above two vents, and exhalation continues until the subject stops blowing. A small magnet holds the piston at the top of the cylinder. In the second phase, the control valve is turned to the 'analyze' position. The piston drops and the breath thus collected is metered (over a period of 20 to 35 seconds) into a test ampoule containing a dichromate solution, with pumping power supplied by gravity on the piston. Electrical contacts built into the top and bottom of the cylinder close the circuits on colored indicator lights to show when the piston is at the top and again at the bottom of its stroke. After the breath has completely bubbled through, oxidation of the alcohol is allowed to continue for one and a half minutes before a reading is taken. In the third phase, the color change in the test ampoule is measured. This is done with the

*Tests for Intoxication,* 45 N. Car. Law Rev., p. 34 (1966) ;
Mason & Dubowski, *Breath-Alcohol Analysis,* 21 Journal

use of a balanced circuit from two photovoltaic cells (similar to those in photographic light meters) mounted one in back of the 'test' ampoule and the other in back of the 'standard' ampoule, with the necessary light supplied by a small (50 cp) bulb mounted between them on a movable rack. By moving the light between the ampoules until the galvanometer reads at zero before the 'analyze' phase, the color (measured in transmitted light filtered at 440 mu) of the two solutions is balanced. If after the 'analyze' phase the color in the 'test' ampoule partially fades due to the presence of alcohol, the light bulb is moved in the direction of the 'standard' ampoule until the galvanometer is restored to zero. The distance through which the light bulb has been moved is indicated on another dial, which is calibrated in figures giving the direct blood alcohol concentration.

"To prevent condensation of moisture from the breath, all breath-carrying components are preheated and maintained at about 47 to 53 degrees Centigrade by a thermostat.

"The test ampoule contains 3 ml. of a .025% potassium dichromate in 50% by volume sulphuric acid. Two minutes from the start of the bubbling, a stopping point with virtually no further change will be reached. The solution in the ampoule is the only chemical used in the test. Highest possible stability is obtained by sealing it in ampoules.

"The photometer which measures the amount of dichromate solution used to oxidize the alcohol in the breath sample is designed to be independent of all outside influences. It will give accurate results independent of line voltage variations, the age of the lamp providing the light source, the accuracy of the photovoltaic cells, and the strength of the chemical solution used. The scale attached to the light movement mechanism shows a linear movement of the light as it balances the entire system. Because it is linear, the test can be started from any point where the light is balanced against the 'standard,' making the strength of the test solution immaterial. If it is much too strong, the sensitivity of the null meter will be reduced, but the answer will be accurate. If it is too weak, the answers will level off at the lower level than full scale, but any test within the possible range will be correct. However, accuracy is dependent upon the volume of the 'test' solutions used, which can be quickly and easily checked.

of Forensic Science 9–41 (1976); Feldman & Cohen, *The Questionable Accuracy of Breathalyzer Tests* (referring to Radio Frequency Interference), 19 Trial 54, June 1983; and Mason & Dubowski, *Alcohol, Traffic, and Chemical Testing,* 20 Clinical Chemistry 126 (1974).

The nature of the chemistry of the breathalyzer and the mechanics of its operation was brought out in the extensive evidentiary hearings held before Judge Frankel. As the evidence at those hearings indicated, the breathalyzer operates on the physiological principle that the amount of alcohol in a person's blood is in a constant relationship to the amount of alcohol in the tested person's breath. It is, of course, the alcohol in the blood carried to the brain that results in intoxication. Thus, the breath containing alcohol, when bubbled through an alcohol sensitive solution (potassium dichromate) in an opened ampoule, will react to form acetic acid, thus reducing the concentration of unreacted potassium dichromate. The opacity of the potassium dichromate solution decreases in proportion to the amount of alcohol in the breath. Thus, the greater amount of alcohol, the greater flow of current through the light sensitive photoelectric cells. This greater current will be shown on the scale, which is an integral part of the breathalyzer machine.

In order to have the machine give a correct reading, the breath sample must be kept at a temperature in the

"The analysis involves but six simple and definite phases, each phase being completed in a number of steps. This serves to minimize possibilities of error resulting from faulty judgment or operator error.

"Based on the accepted blood/breath relationship, 52.5 cc. of breath collected in the sample chamber will furnish a definite amount of alcohol. The alcohol will effect a given change in the transmittance of the test solution. This change in transmittance will necessitate a definite movement of the light to balance out this change. The movement of the light will rotate the shaft of

range of 50°C. to prevent condensation of alcohol at a lower temperature. Two ampoules are used—a test ampoule, through which the suspect's breath is bubbled, and a comparison ampoule, which is kept sealed and is used for photometric comparison purposes.

Both ampoules are placed in gauged brackets, which will demonstrate by the "fit" of the ampoules in the brackets whether the ampoules are either too small or too large. When the ampoules are properly seated, or placed in the brackets, the ampoules are inspected for volume of the solution, which is revealed by the level of the solution's meniscus in relation to the top of the gauged container.

In addition, each batch of ampoules is spot checked and randomly sampled by its manufacturer, by an independent research foundation, and finally by the department of transportation to insure conformity with chemical and physical specifications.

Prior to using the machine, the apparatus is purged by forcing room air into it with an atomizer. The purging process permits any reaction with room air to be completed,[8] and this is followed by a "balancing" of the equipment by moving the light source to such a position that both the test ampoule—the one through which the

---

the scale pointer through a given number of degrees. Thus the movement of the pointer indicates the amount of alcohol in the blood. All these factors are mathematical and the entire analysis can be computed without empirical factors." (F–5, 6, 7)

[8] As the uncontradicted evidence in this case pointed out, room air, as well as residual breath left in the machine, may contain alcohol. Hence, the machine must be balanced and set at zero after the purging and before the analysis of the suspect's breath. This may result in a reaction between the alcohol in the room air and the potassium dichromate solution, but this initial reaction will not affect the breath test results because of the subsequent balancing of the machine. It may, however, leave in the ampoule the byproducts of the reaction, including acetic acid.

suspect's breath will be bubbled—and the comparison ampoule—which is unopened—will show a no-alcohol reading. This is to eliminate the possibility that alcohol-laden air, either from a prior test or the room itself, may contribute to any reading obtained from the suspect's breath. This procedure is designed to insure that:

"1. The air in the room where the test was completed did not contain contaminants which would affect the accuracy of the instrument, and;

"2. The glass bubbler was not contaminated by any material which would affect the accuracy of the test, and;

"3. The glass ampoule and its contents were not contaminated by anything which would affect the accuracy of the test, and;

"4. The high grade of glass used in the manufacture of the glass ampoule, although not optically ground, did not cause a false reading, and finally;

"5. The ampoule or bubbler did not change position in the light path because of the bubbling action, causing an error in the result obtained." Student Study Guide, *Basic Training Program for Breath Examiner Specialist,* Wisconsin Department of Transportation, F–19, 20.

This "balancing" step is particularly noteworthy, for it ensures that the test results will not be skewed by any contaminants in the machine or its connecting parts and that possible optical imperfections in the test ampoule do not contribute to a false reading, *i.e.,* the test ampoule at this point in the procedure, though optically imperfect, would reveal a reading or result that is alcohol free. It is compared at this time to the sealed comparison ampoule, which is known to be alcohol free. If the reading is a "null"—no alcohol, it can be determined before the test begins that an optical imperfection, if any, did not affect the result.

At this stage, the air in the room is again forced through the machine. If the machine has been properly

balanced, the air alcohol should again register a null, subject to a tolerance of .01 percent. If a test reading in excess of that is recorded, the test ampoule must be discarded and the preliminary steps repeated.

If the testing procedures check out to this point, the breath sample is taken by having the suspect breathe into the machine. The test is completed after the breath sample has been in contact with the contents of the test ampoule for just ninety seconds. The theory on which this strict time limit is based is that the silver nitrate is a catalyst which will cause the reaction between the alcohol and the potassium dichromate to be completed in that period. Any other possible contaminants will not react with the reagents in that short a period.

After the lapse of ninety seconds, the BAC, as measured by the breath, will be recorded. It is by balancing the light transmitted between the two capsules, by physically moving the light between them, that the recording device, which is mechanically connected to the light as it is moved, is activated. At the point where the light is balanced, the BAC is determined and is shown on a graduated scale.

As a further check, the apparatus which has been used is checked by an infusion or surge of air that is passed over an alcohol solution, a simulator solution, which is known will result in a blood alcohol reading, if the machine is properly balanced, of .10 percent. If the test result of this known solution varies by .01 percent, the entire test results must be discarded. The alcohol vapors from this simulator solution are bubbled through the test ampoule which had previously been used to analyze the suspect's breath.

Breathalyzer operators in Wisconsin are required to go through and fill out a checklist which incorporates the

above procedures. Twenty-four steps or checkpoints are required to be recorded:[9]

The court of appeals' conclusion in *Booth, supra,* was based upon the assumption that a retained test ampoule, the one through which the suspect's breath was bubbled,

9

**" BREATHALYZER TEST REPORT AND OPERATIONAL CHECK LIST**

*State of Wisconsin / Department of Transportation*

DSP-4036 883

B1. **264374**

| | CITATION NO. | DATE OF TEST | INSTRUMENT SERIAL NO. | MODEL NO. |
|---|---|---|---|---|
| B2: | ⌴⌴⌴⌴⌴⌴● | B3: ⌴⌴ / ⌴⌴ / ⌴⌴● | B4: ⌴⌴⌴⌴⌴⌴● | B5: ⌴⌴⌴⌴● |

NAME (LAST/FIRST/MIDDLE)

B6: ⌴⌴⌴⌴⌴⌴⌴⌴⌴⌴⌴⌴⌴⌴⌴⌴⌴⌴⌴⌴⌴⌴⌴⌴●

| | SEX | DATE OF BIRTH | OPERATOR LICENSE NO. | STATE |
|---|---|---|---|---|
| B8: | ⌴⌴● | B9: ⌴⌴ / ⌴⌴ / ⌴⌴● | B10: ⌴⌴⌴⌴⌴⌴⌴⌴⌴⌴● | B11: ⌴⌴● |

I have observed the subject noted above and certify that he did not smoke, regurgitate, vomit or drink alcoholic beverages for twenty minutes prior to the time a breath specimen was taken.

Simulator Serial Number

Observation started_____ stopped _____

Simulator Model Number

Signed _____ Date _____

**OPERATIONAL STEPS**

Instrument Site

**PREPARATION**

☐ 1. Turn switch ON, UNLOCK and check mechanical center of NULL METER with test lamp off.

☐ 2. Wait until THERMOMETER READS 47 - 53 degrees centigrade. Record temperature. _____ °C

☐ 3. Gauge COMPARISON AMPOULE. Record control number. Insert in left hand holder.

☐ 4. Gauge TEST AMPOULE, record control number, open, REGAUGE LIQUID LEVEL, connect bubbler and hose. Insert in right hand holder. (control no.)

☐ 5. Insert TEST RECORD card.

**PURGE**

☐ 6. Turn to TAKE, flush out, turn to ANALYZE.

☐ 7. When RED empty signal appears, wait 1¼ min., turn on TEST LAMP and BALANCE.

**ROOM AIR BLANK**

☐ 8. Disengage BREATH ALCOHOL POINTER, ink, and set on BASE LINE, just left of 0.00.

☐ 9. Turn to TAKE collect ROOM AIR sample, turn to ANALYZE. Record time.

☐ 10. When RED empty signal appears, wait 1¼ min., turn on TEST LAMP and BALANCE.

☐ 11. Stamp TEST RECORD and remove. Record BREATH ALCOHOL READING. (If reading is 0 01 or greater, discard test ampoule and repeat procedure.) 0 gms/210 Liters

**ANALYSIS** (Insure Subject To Be Tested Has Nothing In His Mouth)

☐ 12. Insert TEST RECORD card.

☐ 13. Disengage BREATH ALCOHOL POINTER, ink, and set on BASE LINE, just left of 0.00.

☐ 14. Turn to TAKE, collect BREATH sample, turn to ANALYZE. Record time.

☐ 15. When RED empty signal appears, wait 1¼ min., turn on TEST LAMP and BALANCE. Stamp TEST RECORD and remove Record BREATH ALCOHOL READING. B12: Refused ⌴● OR ⌴⌴● Indicate By "R" gms/210 Liter

**SIMULATOR TEST**

☐ 16. Insert TEST RECORD card.

☐ 17. Turn to TAKE, flush out, turn to ANALYZE.

☐ 18 When RED empty signal appears, wait 1¼ min., turn on TEST LAMP and BALANCE.

☐ 19. Disengage BREATH ALCOHOL POINTER, ink, and set on BASE LINE, just left of 0.00.

☐ 20. Turn to TAKE, collect SIMULATOR sample, turn to ANALYZE. Record time.

☐ 21. Record SIMULATOR SOLUTION NUMBER.

☐ 22. When RED empty signal appears, wait 1¼ min., turn on TEST LAMP and BALANCE. Stamp TEST RECORD and remove. Record BREATH ALCOHOL READING 0. gms/210 Liters

**DISCONNECT**

☐ 23. Turn to TAKE, flush out, turn to ANALYZE.

☐ 24. When RED empty signal appears, preserve test ampoule and bubbler Turn selector off, cover instrument.

Instrument Operator | Operator's Agency

CLASS II Permit Number

B13: ⌴⌴⌴⌴ .

Name of Officer Requesting Test

Agency of Officer Requesting Test

AGENCY MNEMONIC

B14: ⌴⌴⌴⌴●

*DISTRIBUTION* White—Agency Court Officer, Yellow—Department of Transportation or Time System Operator, Pink—Person Submitting to Test "

was material, *i.e.*, relevant to the question of the suspect's guilt or innocence, because the ampoule, when used in the test, was the key factor in the photometric process of determining whether the suspect's blood alcohol had reached the prohibited level warranting prosecution. Indeed, as the above description of the steps taken in the breathalyzer test has indicated, the infusion of alcohol in the breath bubbled through the contents of the ampoule causes the potassium dichromate solution to change color in proportion to the amount of breath alcohol bubbled through it. Obviously, the physical and chemical characteristics of the test ampoule at the time the test is completed are eminently material to the suspect's guilt or innocence.

The court of appeals in *Booth, supra* at 27, stated:

"Since the contents of the ampoule in this case have been destroyed, the defendant's burden is to clearly establish its materiality and not its exculpatory nature. We believe its materiality is obvious."

The court of appeals went on to state that:

". . . examination of the test ampoule and its contents appears to be the only manner in which the credibility of the test results may be challenged. . . . Whether the machine was capable of correctly determining the amount of alcohol in the defendant's system can only be pursued by an analysis of the ampoule's contents."

The court then, on the basis of the evidence adduced, stated:

"Our review of that testimony [at the suppression hearing] . . . convinces us that the analysis and measurement of an ampoule's contents to determine the presence and volume of necessary chemicals is not a difficult scientific procedure. The testimony further supports the conclusion that the solution will remain in a constant state for a long enough period to allow for independent analysis by a defense expert." P. 30.

The *Booth* court based its affirmance of the trial court on findings which it deemed to be supported by an appropriate quantum of evidence.

These findings of the trial court recapitulated in *Booth,* p. 22, are:

"(1) Retesting of an ampoule cannot recreate the evidentiary breathalyzer test results.

"(2) Capping a used ampoule is not technically difficult or costly.

"(3) The contents of a capped ampoule can be remeasured and can be tested to determine whether the proper chemicals were present and whether they were present in the proper concentrations and proper volume.

"(4) The requisite volume of three cubic centimeters of solution in the test ampoule is essential to the accuracy of the breathalyzer test.

"(5) It is always possible to determine whether or not there was a 0.025 percent potassium dichromate solution in the test ampoule.

"(6) It is possible that the solution in a capped used test sample would be subject to continued chemical change with the passage of time; nevertheless, it is possible to restandardize the breathalyzer test up to 30 days after the test."

It would appear, however, that some of the "facts" relied upon by the court of appeals in *Booth* are not compatible with the realities of the testing procedure recited above, *e.g.,* the court of appeals postulated that, if there were no acetic acid in the used ampoule, then there could have been no alcohol in the subject's breath. The predicate for the statement, however, is inaccurate, for, if the simulator is used, as is required, there always will be the formation of acetic acid in the solution when air is passed through the known solution. Also, the assumption of the court of appeals that the absence of chromium sulfate would demonstrate that no alcohol had passed through the solution is erroneous for the same reason.

One factor does seem clear. The volume of the test ampoule—3ml.—is crucial to the test at the time it is performed. A larger volume will reveal a false low reading; a smaller volume will reveal a false high reading. *See, Basic Training Program for Breath Examiner Specialist,* at F–14; *Breathalyzers: Should the State be Required to Preserve the Ampoules?,* 15 Land and Water Law Rev. 299, 316 (1980). The efficacy of this retest of volume is dependent upon the belief that the ampoule can be opened (by breaking the glass) and then, after the test, removed from a snug fitting gauge or bracket, closed, and stored without any spillage or evaporation, which would reduce the volume, or without any delinquescence, which would increase it.

The court of appeals in *Booth* assumed the materiality of the ampoule, because the materiality in respect to guilt or innocence of the accused was indeed obvious, *but only at the very time of the original test.* The materiality at a later time was dependent upon findings made after extended testimony by experts. There was no such testimony in *Booth* which was relied upon by the court of appeals. Thus, the materiality of the used ampoule was not so obvious that judicial notice could be taken of its materiality. The materiality was subject to proof. Moreover, the *Booth* court did not consider the repeated statements of this court that a breathalyzer test or other scientific tests performed in conformity with the statutory mandate were entitled to a presumption of accuracy. *State v. Humphrey,* 107 Wis. 2d 107, 111, 318 N.W.2d 386 (1982); *City of New Berlin v. Wertz,* 105 Wis. 2d 670, 674, 314 N.W.2d 911 (Ct. App. 1981); *State v. Neitzel,* 95 Wis. 2d 191, 203, 289 N.W.2d 828 (1980); *Suspension of Operating Privilege of Bardwell,* 83 Wis. 2d 891, 900, 266 N.W.2d 618 (1978); *State v. Trailer Service, Inc.,* 61 Wis. 2d 400, 407–08, 212 N.W.2d 683 (1973). The court of appeals instead relied

on an unwarranted presumption of materiality—unwarranted for it was based upon facts that were applicable only to the time the original test was performed. Moreover, the *Booth* court, in finding the materiality obvious and of constitutional proportions, and relying on *Lauderdale v. State,* 548 P.2d 376 (Alaska 1976), equated the production of a breath ampoule with the right of cross-examination and the inability to inspect an ampoule as being tantamount to the denial of the constitutional right of confrontation. While that analysis has some superficial appeal, its rationale as the equivalent of confrontation is explained neither in *Lauderdale* nor in *Booth.*

The reliance of the *Booth* court for its general rationale was not on findings by the trial court in that case, but upon the findings of other courts in other states, *e.g., People v. Hitch,* 12 Cal. 3d 641, 117 Cal. Rptr. 9, 527 P.2d 361 (1974).[10]

While our survey of the various jurisdictions of this country leads to the conclusion that more of them reject the materiality of used test ampoules than accept them, we conclude that the question is an evidentiary one dependent upon the facts. This state's policy in respect to the prosecution of intoxication on the highways should not be diluted by the findings of trial courts in other states.

---

[10] Moreover, we note that California does not insist on the strictures of *Hitch* as a necessary ingredient of due process. Where an intoximeter is used, and it can be used alternatively in California, the test results are accepted without a retesting of any of the breath samples or of the chemicals used, for no retesting is possible. All the active components utilized in the intoximeter are consumed in the testing. It seems incongruous that a device, not necessarily more intrinsically reliable than the breathalyzer, can be accepted without the necessity of expert testimony appraising the residuals of the test, while the breathalyzer, in California, cannot be accepted. *People v. Miller,* 52 Cal. App. 3d 666, 125 Cal. Rptr. 341 (1975).

The significant breathalyzer cases following *Booth* appear to rely on the findings made in the *Booth* case. *State v. Raduege,* 100 Wis. 2d 27, 301 N.W.2d 259 (Ct. App. 1980), extended, apparently as a matter of law, the *Booth* decision to hold that it was possible to test the used ampoule for material evidence as to guilt or innocence and, hence, there was an explicit presumption of materiality, a presumption that was only implicit in *Booth.*

Moreover, because the state did not present any evidence to rebut the presumption, *Raduege* in essence held that the presumption of materiality is not only obvious, but has continued validity, not only for thirty days, but for an indefinite and protracted period unless the state rebuts that presumption. *Raduege* made clear, however, that the presumption could be rebutted by a showing by the state that the ampoule at a particular time was no longer of evidentiary value, *i.e.,* was no longer material on the issue of the accused's guilt or innocence.

The only ampoule case decided by this court did not address the materiality of a used ampoule—*State v. Humphrey,* 107 Wis. 2d 107, 318 N.W.2d 386 (1982)—but only determined, as a matter of civil procedure, that a breath ampoule need not be produced when the request for discovery was general in nature. Although this court treated *Humphrey* in its time frame as a post-*Booth* demand for a breathalyzer test ampoule, the status of the ampoule as being material *vel non* was not addressed as a controlling issue in that case. *City of Lodi v. Hine,* 107 Wis. 2d 118, 318 N.W.2d 383 (1982), also addressed the question of the production of a test ampoule, but the ruling was not made on the basis of materiality under the *Booth* rationale. Rather, we held that it was producible as one of the "devices used to determine presence of alcohol" (at 121) under sec. 345.421, Stats. The court did not consider or discuss the materiality of the ampoule

evidence. Suppression was approved in *Lodi*, not because there was a denial of due process, but as a sanction for the city's failure to obey a court order.

Hence, the case before us is the first in which we have had the opportunity to review a detailed transcript of a trial court on the issue of whether or not a used breathalyzer test ampoule is retestable after some time has elapsed following the challenged test and whether a retest can furnish any evidence material or relevant to a suspect's guilt or innocence in respect to OMVWI (alcohol).

As the facts set forth at the beginning of this opinion indicate, the incident of driving while intoxicated arose prior to the release of the *Booth* case. However, both *Booth* and *Raduege (State v. Raduege,* 100 Wis. 2d 27, 301 N.W.2d 259 (Ct. App. 1980)) were released during the course of the trial court proceedings.

The trial judge handled the case in accordance with the burden of proof mandated in those two cases. He gave the defendant the benefit of the *Booth* and *Raduege* presumption—that the spent ampoule was material on the question of the accused's guilt or innocence—and, also, consistent with his view of the facts in the instant case and the law as set forth in *Booth* and *Raduege,* the trial judge held that the presumption could be rebutted by the state. The trial judge in his opinion stated:

". . . the state has adequatley rebutted any presumption of materiality of the breathalyzer ampoule as regards its preservation for the purpose of measurement of its acetic acid content."

Thus, there is no merit in the defendant's contention that the trial court improperly shifted the burden of proof to the defendant. The trial judge afforded the presumption of materiality to the defendant and placed the burden of rebutting that presumption on the state.

At an intermediate point in the hearing, the trial judge stated:

"[T]he State has offered some significant rebuttal to the presumption that is established in the Raduege opinion, and it would be up to the defense to go forward to attempt to reestablish the presumption they were originally entitled to under the terms of *Booth* and *Raduege*."

It is difficult to understand the defendant's contention that he was improperly required to produce evidence. The record reveals that the state assumed and discharged its burden of rebutting the presumption. The defendant there failed to produce further evidence that the trial judge, as the finder of fact, found sufficient to re-establish the materiality of the test ampoule.

The defense moved for the production of the test ampoule, but as the facts above demonstrate, this motion was made forty-three days after the test was administered. While the state claims that the motion was untimely made, we conclude that there is reason, including a possible waiver by the state, for not addressing the question of timeliness, but rather to address only the question of when, if ever, a used test ampoule is material to the defense of a driving while under the influence of an intoxicant charge—bearing in mind that the ampoule was destroyed in conformity with the then accepted breathalyzer procedures.

The defendant relied upon the presumption of materiality and also elicited evidence which it believed showed the ampoule, had it been produced even forty-three days following the test, would have revealed evidence material to guilt or innocence. The defendant's proof and argument was founded on the fact, which is undisputed, that the passage of breath alcohol through

the potassium dichromate solution in the ampoule could cause a chemical reaction creating acetic acid. It was additionally the defendant's theory that acetic acid was a stable compound which would remain in a constant quantity for a long period of time; and to the extent there was any change in the acetic acid content in a used ampoule over time, the change or degradation would be at a constant rate. Thus, it was the contention of the defendant's expert, Dr. Robinson, Professor of Pharmacy at the University of Wisconsin, that, had the ampoule been produced even months later, a determination of the quantity of acetic acid in the used ampoule could be made; and from this, it would be possible by a simple mathematical process to determine the blood alcohol content of the suspect at the time the test was made.

Dr. Robinson's expertness and general knowledge of the chemistry utilized in the breathalyzer was unchallenged. In his testimony he recognized important factors that clearly went unrecognized in *Booth* and *Raduege,* *i.e.,* the routine use of the simulator solution and possible alcohol contamination by room air.

The testimony of Dr. Robinson is well summarized in the defendant's brief, pages 17–18:

"The main focus of Dr. Robinson's testimony was his testimony that it would be possible, for a period of time after the breathalyzer test, to extract and measure the acetic acid which is produced during the test by the reaction of alcohol with the breathalyzer solution. He testified that the amount of acetic acid in the used ampoule would be proportional to the amount of alcohol that had been introduced into the system. He testified that he believes, to a reasonable degree of scientific certainty, that with proper storage the acetic acid in the used ampoule would remain stable for at least 43 days, and probably for at least six months. . . . In Dr. Robinson's view proper storage could easily be accomplished. . . . He further stated that if further experimentation showed that in fact the amount of acetic acid did not remain

constant over this time period, the rate of degradation could be determined by accepted scientific methods and one could extrapolate back to determine the amount of acetic acid that must have been present at the completion of the test itself. . . .

". . . He testified that one could 'subtract out' the portion of acetic acid produced in the solution by sources other than the subject's breath (e.g. the simulator solution) and arrive at a figure which would correspond, within accepted levels of scientific error, to the blood alcohol level of the subject. . . .

". . . Dr. Robinson admitted that his method has not yet been proven by application to actual used ampoules."

The state called as its expert Dr. Patricia Field, Chief of the Toxicology Section of the Wisconsin Laboratory of Hygiene, a part of the University of Wisconsin system. Unlike Dr. Robinson, she evinced a familiarity with the mechanics and the actual operation of the breathalyzer, as well as familiarity with the chemical and physical properties of the materials and chemicals used in the breath test.

The thrust of Dr. Field's testimony was that the potassium dichromate solution of the breathalyzer ampoule undergoes "unpredictable" changes after being exposed to alcohol vapors, and that the solution is extremely unstable, does not degrade or change in a predictable way, and reacts even with nonalcoholic organic contaminants over a period of time in such a way as to form acetic acid. Her general conclusion was that, as soon as two days following the test, a used ampoule would be utterly useless to retest for the determination of blood alcohol content at the time of the original test.

She based her opinion on extensive and lengthy experiments using the actual contents of used ampoules. Her conclusion that the used ampoule was irrelevant and immaterial in respect to the guilt or innocence of the accused, *i.e.,* blood alcohol content at the time of test, was completely confirmed by a paper written by Dr. Kurt

Dubowski, which was admitted into evidence without objection.

The basic difference in the conclusions of the litigants' two experts stems from the nature of the experiments conducted by each. Dr. Robinson conducted only two experiments, and these in a single day. In each experiment he prepared a solution having the same chemical composition as that of a breathalyzer ampoule. However, instead of introducing alcohol into the solution, as would be done by the introduction of alveolar breath of an intoxicated person in a breathalyzer test, he introduced a known quantity of acetic acid. He then, later on the same day, extracted the acetic acid from the solution. He discovered that the amount which could be extracted equaled the amount which was put into the simulated solution earlier on the same day.

The general premise of his experiment was that alcohol in the breathalyzer solution results in the formation of acetic acid in proportion to the concentration of blood alcohol. Therefore, if the same quantity of acetic acid could be extracted from this simulated ampoule a few hours later, the amount of acetic acid to be found in a spent ampoule would be the same as that which would have been found immediately after the breathalyzer test. Hence, the used ampoule could be assayed to determine the quantity of acetic acid, and from this the BAC of the suspect at the time the test was administered could be calculated. He reasoned that, because acetic acid was stable, a used ampoule could furnish such material evidence for at least six months. This conclusion was reached although his actual experiment only demonstrated the stability of the acetic acid in the potassium dichromate solution for a very few hours.

The state's expert was Dr. Patricia H. Field, Chief of the Toxicology Section at the Wisconsin Laboratory of Hygiene at the University of Wisconsin. She, on the other hand, conducted three different and protracted

experiments upon which she based her conclusion that, to a reasonable degree of scientific certainty, the spent ampoules cannot be used or stored in any way that would make it possible to determine what the subject's actual breath alcohol, or BAC, was at the time of the initial test.

The first experiment Dr. Field conducted involved the use of two actual breathalyzer ampoules, one of which she injected with .06 percent alcohol and the other with no alcohol. Both ampoules were injected with room air in an amount equal to the air introduced into the system by a subject's breath. The ampoules were then sealed in airtight plastic containers and were protected from extremes of light and temperature. Within two days the vial which initially read .06 percent alcohol read greater than .1 percent alcohol. The vial which contained no alcohol read .04 percent alcohol within two days after the test was originally administered. Within thirty days both vials read greater than .15 percent alcohol; and, at that point, the vial which had no alcohol in it initially began to show a higher percentage than the one to which alcohol had been added. Dr. Field stated that this experiment showed that, not only was neither vial stable, but also that both vials were unstable in an unpredictable fashion. The last time Dr. Field read the two ampoules was ninety days after they were initially prepared. At ninety days the ampoule which had *no* alcohol added was reading off the scale of greater than .4 percent alcohol and the one which initially read .06 percent alcohol read greater than .2 percent alcohol.

In the second experiment Dr. Field conducted, the ampoules were preserved in small glass containers in an effort to eliminate any effects which may have resulted from the use of plastic storage containers in the first experiment. In this experiment, every day for fourteen days, Dr. Field opened three vials and, to each, added an identical amount of alcohol and immediately sealed

them, and they were not reopened. The vials were stored in the dark at room temperature until the end of the fourteen days, at which time Dr. Field took them all and measured them in a spectrophotometer, which is a more precise measuring device than the breathalyzer. Dr. Field found that, between two to fourteen days, there was no change in the dichromate. However, between zero and two days, there was a significant change. The ampoules which started out showing a reading of .05 percent ended up showing a reading of .068 to .07—almost a 40 percent change measured by the dichromate color in the first two days. This, Dr. Field said, "confirmed the idea that there are things that are reacting with the dichromate which do not react to the first 90 seconds of the breathalyzer test but tend to react during storage." Thus, a test of an ampoule even two-and-a-half days after the test was administered, she said, would not give an accurate measurement of the subject's original blood alcohol content.

The third and final experiment conducted by Dr. Field, at a laboratory drinking party, involved numerous human subjects blowing into breathalyzer ampoules. A breathalyzer test reading was made at the time of the initial test and again at two-and-a-half days afterwards. These ampoules were stored in a dark room and at room temperature. Dr. Field found that some of the ampoules changed substantially in the two-and-a-half days, while others changed less. One subject was a diabetic with some breath acetone. His initial reading was .015, and after two-and-a-half days the spent ampoule was reading .036, twice the original result. Another subject was a female menthol smoker whose initial reading was .014, and two-and-a-half days later the reading was .039, which is almost three times the original reading. From experiment 3, Dr. Field concluded that:

"[V]olatile organic substances on the subjects' breath may contribute to the initial change in breathalyzer re-

sults, even within the first two and a half days. Therefore, it would not be possible to know with certainty what the breathalyzer result would have been two and a half days previously when one has an ampoule from a human subject even two and a half days [after the test is administered]."

Dr. Field, in the course of her testimony, also stated the following: That acetic acid which is stable in its pure form is very volatile in a solution of sulfuric acid and potassium dichromate; that the degradation of acetic acid is not predictable and not measurable, because the ampoule solution is corrosive and consequently has different rates of degradation; that the extraction efficiency testified to by Dr. Robinson is questionable, because he did not determine that the experiment was reproducible because only two experiments were conducted; that there is no way of storing and sealing ampoules to prevent a change in the potassium dichromate color; that the chemical concentration of the ampoules is checked by three different laboratories, (1) the manufacturer's own quality control lab, (2) the independent laboratory which the manufacturer must supply if it wants to sell to the Wisconsin Department of Transportation (DOT), and (3) the Wisconsin DOT selects 6/10,000 to conduct independent tests of its concentration; that two doctors, Dr. Kurt Dubowski and Dr. Edgar Kirela, who are the leading authorities on ampoule preservation, have tried to extract quantities of acetic acid from spent ampoules but were unsuccessful (although Dr. Field did not herself attempt to assay acetic acid from spent ampoules); and that it is not possible to ascertain the amount of alcohol in the tubes the subject blew into without conducting a test on the breath tubes used at the original test—apparently, these breath tubes are not standardized.

The trial judge in his memorandum opinion analyzed the testimony of the two opposing experts. In the course of that opinion, commenting on the evidence, the trial judge made the following findings of fact:

"1. The stability of acetic acid in the chemicals comprising the breathalyzer solution has not been shown, and that there is no method of stabilizing the chemicals in a used ampoule.

"2. The extraction of acetic acid from an ampoule solution has never been accomplished except in the single-day experiment conducted by Dr. Robinson, wherein he was able to extract from a simulated ampoule solution the same quantity of acetic acid that he had injected only a few hours before. This experiment had substantial shortcomings, and the reliability of Dr. Robinson's opinion is in doubt.

"3. There is no evidence that acetic acid has ever been extracted from a real ampoule.

"4. The methods used by the defense expert to show acetic acid are not proved to be reliable when attempted to be applied to real ampoules.

"5. The contribution of room air and simulator solution to the results can easily be factored out, but the amount of acetic acid which results from residual alcohol in the breathalyzer tubing cannot be factored out. In the absence of an accurate evaluation of that contribution of residual alcohol, the preservation of the ampoule for the measurement of acetic acid (even if stabilized) would result in no material evidence of the defendant's guilt or innocence.

"6. The breathalyzer ampoule is not designed to be recapped so retesting of volume can be accomplished. There is no evidence that volume will not be lost as the result of evaporation. Recapping would be difficult, if not impossible. No matter how carefully handled, spillage is possible.

"7. Volume is best checked before the test is conducted by the use of the "go/no go" gauge, which is a part of the apparatus.

"8. Volume of solution is critical, but a post-test examination upon production of ampoule is unreliable be-

cause of spillage and evaporation. An ampoule contains a very volatile solution. The only reliable test of volume occurs before an ampoule is opened.

"9. The breathalyzer operator is available for cross-examination in respect to proper volume of ampoule solution.

"10. Correct concentration of chemicals at time of test has never been verified or disproved by tests of used ampoules. There is no evidence that the correct concentration of potassium dichromate can be verified by a test of the used ampoule.

"11. There is evidence that the concentration of potassium dichromate can vary considerably and still produce satisfactory test results.

"12. The possibility of test error due to imperfections in the glass is eliminated by the photometric balancing between the test ampoule and the reference ampoule, which is accomplished before the test begins. This photometric balancing is unique (depending on placement and orientation in the gauge brackets) and cannot be duplicated. Reexamination of test ampoule for examination of flaws can produce no material evidence.

"13. The presence of non-alcoholic foreign substances is unlikely to present a false reading, because there are few substances (other than alcohol) which react with the reagents in the ninety seconds allowed for the test.[11]

"14. Any possibility of presence of non-alcohol contaminants which would give a false high reading during the ninety-second test is eliminated by the twenty-minute observation required by mandated procedures.[11a]

---

[11] Note, however, the testimony of Dr. Field that most contaminants react with the solution over a more protracted period and can cause a false high reading in a retained used ampoule.

[11a] Dr. Field stated that in her third experiment, some subjects who reported that they did not drink at all had initial breathalyzer readings of approximately .015. She attributed these presumably false high readings to the presence of volatile organic substances in their breath from recently eaten foods such as

"15. Cross-examination of the breathalyzer operator is the only method of obtaining material evidence on whether the test was properly administered in a particular situation."

We have carefully examined the transcript of testimony and the exhibits produced at the hearing on the motion to suppress the results of the breathalyzer test. The findings, which are set forth in the course of the trial judge's memorandum opinion and which we have itemized above, are supported by evidence that is not contrary to the great weight and clear preponderance of the evidence. *State v. Hoffman,* 106 Wis. 2d 185, 216, 316 N.W.2d 143 (1982); *Bies v. State,* 76 Wis. 2d 457, 469, 251 N.W.2d 461 (1977). We affirm these findings and, on the basis of the facts so found, affirm the conclusion of the trial judge that a used ampoule—even had it been produced—could not have supplied evidence material to the guilt or innocence of the accused. Accordingly, the trial court, on the basis of the facts, correctly denied the defendant's motion to suppress.

Although the trial judge in his memorandum opinion did not expressly denominate the above listed findings

---

jalapeno pepper dip or onion dip. On both direct and cross-examination, she testified that she had not waited twenty minutes before taking these breath samples. She further testified that, when the twenty-minute waiting period is observed, nonalcoholic organic substances in the breath such as smoke and food do not distort the initial breathalyzer readings:

"Within the 90 seconds alcohol is virtually the only organic substance present in a human being's breath in sufficient concentrations and of sufficient reactivity to cause a substantial breathalyzer reading. Other things that have been studied, like acetone or toluene and food substances on the subject's breath do not react sufficiently in the first 90 seconds to cause a substantial change in the breathalyzer result. Furthermore, the 20 minute waiting period prevents any very large quantities of food substances or cigarette smoke, that kind of thing being present."

as "findings of fact," it is clear they are that. We have repeatedly held that, for convenience on review—to the parties as well as to the appellate courts—it is preferable that findings be expressly and separately set forth. The failure to do so, however, is not fatal, and findings can be gleaned from a trial judge's decision. *Termination of Parental Rights to T.R.M.*, 100 Wis. 2d 681, 688, 303 N.W.2d 581 (1981); *Haugen v. Haugen*, 82 Wis. 2d 411, 415, 262 N.W.2d 769 (1978); *Lavota v. Lavota*, 70 Wis. 2d 971, 974, 236 N.W.2d 224 (1975); *Walber v. Walber*, 40 Wis. 2d 313, 319, 161 N.W.2d 898 (1968).

Although we have found the statements in the judge's memorandum opinion to constitute findings of fact, a problem is presented by the fact that the trial judge stated, "[T]he *Frye* test remains the accepted standard for admissibility of scientific testimony." He then stated that the testimony of Dr. Robinson was inadmissible. The reference by the trial judge was to a sixty-year-old United States Court of Appeals case *Frye v. United States,* 293 F. 1013 (C.A. D.C. 1923). This case has never been explicitly accepted in Wisconsin and, in fact, has been explicitly rejected. The trial judge erred when he stated that he was "constrained by the principles elucidated in *Frye* . . . ," and he was incorrect when he stated the *Frye* test was the accepted standard for the admissibility of scientific testimony. We hasten to add, however, that this court's treatment of *Frye* had not been marked by certainty or consistency.

A brief recapitulation of the references to *Frye* in Wisconsin case law is appropriate. *Frye* was cited in *State v. Bohner*, 210 Wis. 651, 246 N.W. 314 (1933). The words of *Frye* that are usually quoted to capsulize the *Frye* test were stated in *Bohner:*

"[T]he thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Pp. 657–58.

This formulation is considered to be a test of admissibility. *See,* Saks & Van Duizend, *Scientific Evidence in Litigation,* p. 66 (1983). However, this test of admissibility is foreign to our code of evidence. Wisconsin Rule of Evidence 904.02 provides that "[a]ll relevant evidence is admissible." "Relevancy" is defined by Rule 904.01:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Nowhere in the Wisconsin Rules of Evidence or in the extensive commentaries to it is the *Frye* rule mentioned. Under our rules, if the evidence is relevant, it is admissible, unless it is excluded for some special reason, such as prejudicial effect or jury confusion.

The rules in regard to the admission of expert testimony are also clear. The Wisconsin Rule of Evidence, sec. 907.02, Stats., **Testimony by experts**, provides that, if scientific or specialized knowledge will assist the trier of fact to determine a fact in issue, a qualified expert may testify. As the commentary to Rule 907.02 points out, under Rule 907.02, expert testimony is admissible if relevant and will be excluded only if the testimony is superfluous or a waste of time. The *Frye* concept is alien to the Wisconsin law of evidence.

Our examination of *State v. Bohner, supra* leads to the conclusion that *Frye* was cited therein because it was the only theretofore reported polygraph case and was not cited to import a new test of admissibility into Wisconsin law. The emphasis in *Bohner* was not upon the scientific principle on which *Frye* purports to concentrate, but on the device itself—the polygraph. As the *Bohner* court said, the use of polygraph evidence could result in a protracted trial of the machine itself, with a never-ending contest between experts. The citation of *Frye*

in *Bohner* did not constitute an acceptance of the *Frye* rule. Justice John D. Wickhem, who wrote *Bohner* for the court, was a professor of evidence at the University of Wisconsin Law School and was a member of the American Law Institute's advisory group on the Model Code of Evidence. It is inconceivable that he would have incorporated *Frye* into Wisconsin law without expressly saying so. It is equally inconceivable that he would have done so by inadvertence.

The *Frye* principle was referred to in dicta by this court in *State v. Stanislawski*, 62 Wis. 2d 730, 216 N.W. 2d 8 (1974). We said:

"We need not reject the *Frye* test to have reason to inquire . . . whether the lack of general acceptance, then found to exist, still persists." P. 737.

In *Stanislawski*, we went on to hold that polygraph evidence be conditionally admissible, because polygraph tests had reached a "degree of standing and scientific recognition that unconditional rejection of expert testimony based on polygraph testing is no longer indicated." P. 741. The usual standard for the qualification of an expert witness was adhered to, but the admission of polygraph testimony was conditioned upon stipulation of the parties and the approval of the trial judge in respect to the circumstances of the test. Thus, while this court in *Stanislawski* thought it necessary to dispel the phantom holding of the *Frye* dicta in *Bohner*, it neither expressly ratified nor expressly rejected *Frye*. It conditionally accepted polygraph testimony on newly articulated public policy grounds, *i.e.*, that the polygraph evidence was used as a lie detecting device in various human pursuits and testimony derived from polygraph tests appeared to compare favorably with other types of expert testimony. *Id.* at 738–39. *Stanislawski*, however, did not accept nor

reject *Frye*. That determination was unnecessary to the decision.[12]

In *Watson v. State*, 64 Wis. 2d 264, 219 N.W.2d 398 (1974), this court explicitly rejected *Frye*. In that case, we cited the reference to McCormick, *Evidence* (2d ed., hornbook series), sec. 203, p. 489, which criticizes the *Frye* rule and points out that:

" ' "General scientific acceptance" is a proper condition for taking judicial notice of scientific facts, but not a criterion for the admissibility of scientific evidence.' " P. 273.

McCormick used almost the exact language of the committee which prepared the Wisconsin Code of Evidence when he wrote:

" 'Any relevant conclusions which are supported by a qualified witness should be received unless there are other reasons for exclusion.' " P. 273.

In *Watson*, then, although there was no explicit evidence of general acceptance in the scientific community that a hair sample could be identified as coming from a particular individual, the court concluded, consistent with our rules of evidence, "that the identification of the chin hair was a matter of expert testimony that could be challenged by cross-examination or by impeaching evidence." P. 274. We held the evidence, if given by a qualified expert, was admissible irrespective of the underlying theory on which the testimony was based. The

---

[12] *State v. Dean*, 103 Wis. 2d 228, 307 N.W.2d 628 (1981), overruled *Stanislawski*. While *Frye* was cited, probably because it was referred to in the *Stanislawski* dicta, *Dean* expressly stated, "We do not however treat this case as the occasion to examine the *Frye v. United States*, 293 Fed. 1013 (D.C. Cir 1923), standard for admissibility . . . ." *Dean* in no way considered, let alone ratified, *Frye*. *State v. Armstrong*, 110 Wis. 2d 555, 329 N.W.2d 386 (1983), pointed out that, were the *Frye* test the law in this jurisdiction, it had no applicability under the facts of *Armstrong*.

fundamental determination of admissibility comes at the time the witness is "qualified" as an expert. In a state such as Wisconsin, where substantially unlimited cross-examination is permitted, the underlying theory or principle on which admissibility is based can be attacked by cross-examination or by other types of impeachment. Whether a scientific witness whose testimony is relevant is believed is a question of credibility for the finder of fact, but it clearly is admissible. *Frye* was clearly and unequivocally repudiated in *Watson*.

Consistent with our rationale in *Watson*, the Louisiana Supreme Court rejected *Frye* in *State v. Catanese*, 368 So. 2d 975, 979 (La. 1979), stating:

"The 'general acceptance' standard has been the subject of considerable scholarly criticism in recent years. In particular, it has been suggested that the requirement of 'general acceptance' is tantamount to a requirement that the validity of the test be susceptible of such demonstration as to enable the trial court to take judicial notice of the fact. Clearly, the criteria used for determining the admissibility of scientific evidence should not require the instant and unquestionable demonstration required for the judicial notice of scientific facts. Other types of scientific evidence have been admitted into evidence under less stringent standards which merely require the evidence to be 'an aid to the jury' or 'reliable enough to be probative.' " (Notes omitted.)

This is the relevancy test of our rules and we adhere to it.

It is clear, therefore, that the trial judge's reliance upon *Frye* does not find support in the law of evidence of Wisconsin.[13]

---

[13] The excellent article, Giannelli, *Frye v. United States, a Half Century Later*, 80 Columbia Law Rev. 1197 (1983), criticizes the *Frye* rule as unworkable, but also argues that the alternative relevancy rule of the type accepted in Wisconsin may also present evidentiary pitfalls and create undue reliance on expert witnesses.

Having concluded that the trial judge should not have relied upon *Frye* does not require that the order of the court denying suppression be set aside. It is clear that he did not in fact rely on *Frye* to exclude the testimony of Dr. Robinson from consideration. His opinion demonstrates that, in fact, the expert testimony of Dr. Robinson was in evidence. Judge Frankel carefully analyzed the evidence of Dr. Robinson and set forth the reasons why he did not give credence to that testimony. The trial judge carefully discusses his testimony. The empirical basis of Dr. Robinson's testimony was thoughtfully and thoroughly analyzed. There was no rejection of the basic scientific principles upon which Dr. Robinson relied, nor was there even a rejection or contradiction of the particular techniques used by Dr. Robinson. It is doubtful, even were *Frye* applicable, that that case would mandate the nonadmission of Robinson's testimony. Rather, the entire trial judge's memorandum opinion reflects that the judge gave credence to Dr. Field's testimony and not to Dr. Robinson's because of the extensive and realistic nature of her experimentation, as contrasted to the simulated experiments of Dr. Robinson, which, while based upon impeccable theory, could not be empirically demonstrated as being credibly probative by Dr. Robinson's less than a full-day experiment. The judge, as the trier of fact, chose to believe Dr. Field and not Dr. Robinson for the reasons stated in his memorandum opinion—the lack of realistic reproduction of actual breath test conditions in examining the simulated solutions prepared by Dr. Robinson and, even for these mockup ampoule solutions, the test period encompassed a very short time, not at all simulatory of actual breath test ampoule-retention conditions. Dr. Robinson's experiment covered a few hours in a single day; Dr. Field's

It purports to accommodate this problem by adjusting the burden of proof.

experiment extended over a six-month period. Applying the trier of fact's prerogative to give the credibility nod to one witness rather than another, the trial judge chose to believe the state's witness. He stated that the experiments of Dr. Robinson revealed substantial shortcomings. The evidence of both experts was, however, admitted and was a part of the trial judge's rationale. The record amply supports the findings of fact made by the trial judge which were based upon evidence of record which was believed by the trial judge.

The evidence as admitted, including some testimony of Dr. Robinson, supports the findings of the court and its ultimate conclusion that the used test ampoule is incapable of any meaningful retest. It cannot, on the basis of the evidence before us, be a source of any evidence material to the guilt or innocence of the accused except at the very time the test was performed.

The quest for used ampoules is an exercise in futility which can afford no exoneration (and that is what is sought) for a defendant and can provide no additional proof of guilt.

Our conclusion as stated above and based on the carefully adduced evidence in this case is in marked contrast to that reached by the court of appeals in *Booth*. *Booth* found the production of the used ampoules an essential of due process.

Neither *Booth* nor the cases which rely on it reveal any extensive record showing that, in fact, a used ampoule has any materiality. *Booth* relies upon the *ipse dixit* that materiality is "obvious," because it is the reaction in the test ampoule itself which determines the guilt or innocence of the accused. This, of course, is true. It is apparent, however, that such "obvious" materiality is limited to a particular and a limited period of time—the time the test was made. *Booth* recognized that the materiality would be likely to diminish as time went on, but never-

theless concluded that, because materiality was "obvious," the presumption of materiality continued—a presumption which inured to the benefit of a defendant and which required that the prosecution produce evidence to rebut the presumption.

The evidence in this case places the basic assumption of the *Booth* case in extreme doubt. The evidence herein is to the contrary. Accordingly, we expressly overrule *Booth* on the basis of the conclusion we reach in affirming the findings in this case—that materiality is not "obvious" except at the moment of test and that, almost immediately thereafter, the color, chemical composition, and physical condition of the ampoule is irrelevant to the accused's guilt or innocence. Its production is not relevant to due process in that it cannot supply any material evidence in respect to the defendant's BAC.

Subsequent to the trial court decision in this case, the legislature, by sec. 343.305(10)(d), Stats. 1981–82, apparently in response to *Booth,* mandated that law enforcement authorities shall keep used ampoules for at least thirty days. We, of course, do not overrule that legislative directive, but it is apparent that the legislature was misled by the opinion in *Booth* and subsequent opinions, of the court of appeals and this court, which did not have occasion to reexamine the factual underpinnings of conclusions in *Booth.* The failure to produce such ampoules is, however, irrelevant to due process, for they cannot be retested to provide any evidence that is material to a defendant's guilt or innocence. The constitutional requirement of due process does not impel the enforcement of sec. 343.305(10)(d).

We do not deny the legislature's power to compel the production of used breath ampoules. We do conclude, however, that they afford no protection to the defendant

and do not bolster the case for the prosecution. While we would ordinarily and routinely defer to a legislative directive as being based upon a sound foundation of fact and public policy and would follow the consequences of such legislative fact finding, generally without question, here it is apparent the legislative directive was based upon decisions of the courts. Hence, we are not obliged to give sec. 343.305 (10) (d), Stats., deference. The statute is a product of judicial precedent, and we may disregard it. At the very least, it is apparent that the failure or the inability of the prosecution to preserve, and later to produce, an ampoule as required by the statute is irrelevant to due process.

Nevertheless, the due process rights of a defendant accused of operating a motor vehicle while under the influence of an intoxicant must be protected. The presumption of innocence applies, but the production of a breath ampoule affords no due process protection. We believe that the protection to an accused sought to be afforded by breath ampoule production, either by decisional or statutory law, was chimerical and counterproductive to the rights of the defendant and the state.

The statutes and the common law, however, afford important safeguards for a defendant, which this court will enforce. Among these is the right to cross-examination—the essential element of confrontation of witnesses. In a case such as this, where the procedures of testing are of paramount importance, due process may be assured by cross-examination of the breathalyzer operator to make certain that the presumption of accuracy given to scientific tests is afforded only in circumstances when the mandated procedures are strictly followed. Conversely, tests which the cross-examination reveals do not conform with required procedures can be discredited.

These important rights are secured by the timely exercise of the discovery rights afforded by secs. 345.421 and 971.23(4) and (5), Stats,[14] and by the invocation of constitutional rights.

As the trial judge correctly found, the defendant has the absolute right to call the breathalyzer operator to insure that proper procedures were followed, that the operator was competent, and that the steps in the breathalyzer test process which are designed to insure due process were in fact followed.

Additionally, due process may be guaranteed by assuring that a second test will be given, so that any possible exculpatory evidence will be available. Sec. 343.305(5), Stats., provides:

"**343.305 Refusal to submit to chemical tests.**

"(5) In addition to a test administered upon the request of a law enforcement officer under sub. (2), a person who was the operator of a motor vehicle involved in an accident resulting in great bodily harm or death to any person or a person arrested for a violation of s. 346.63(1) or a local ordinance in conformity therewith, or s. 346.63(2) or 940.25, or s. 940.09 if the offense involved the use of a vehicle, shall be permitted, upon his or her reqeust, the alternative test provided by the agency under sub. (1) or, at his or her own expense, reasonable opportunity to have any qualified person of his or her own choosing administer a chemical test for the purpose specified under sub. (1). If a person has been arrested for such a violation and he or she has not been requested to provide a sample for a test under sub. (2)(b), the person may request a breath test to be administered by the agency or, at his or her own expense, reasonable opportunity to have any qualified person administer any test specified under sub. (2)(b). The failure or inability

---

[14] It is clear, however, that a used breath ampoule is not an item of physical evidence intended to be introduced at trial by either party. Nor, as is demonstrated by the facts in this case, is it susceptible to any meaningful scientific analysis. Because it is a meaningless item even if introduced into evidence, its nonproduction is irrelevant under either sec. 345.421 or sec. 971.23 (4) or sec. 971.23(5), Stats.

of a person to obtain a test at his or her own expense shall not preclude the admission of evidence of the results of any test administered under sub. (2)(b). If a person requests the agency to administer a breath test and if the agency is unable to perform that test, the person may request the agency to perform a test under sub. (2)(b) that it is able to perform. The agency shall comply with a request made in accordance with this subsection."

Sec. 343.305(1), Stats., also provides, in part, that:

"The law enforcement agency by which the officer is employed shall be prepared to administer, either at its agency or any other agency or facility, 2 of the 3 tests under sub. (2)(b), and may designate which of the tests shall be administered first."[15]

Sec. 343.305(3)(a), Stats., after reciting the policy agency's general duties in respect to intoxication tests, provides that the law enforcement officer shall, at the time of the request and prior to any test, inform the subject:

"3. That in addition to the tests designated by the law enforcement agency under sub. (1), he or she may have an additional test under sub. (5)."

The failure on the part of the state to provide the defendant with a reasonable opportunity to procure a timely second test has been held by some jurisdictions to be a deprivation of due process. *McNutt v. Superior Court of Arizona,* 133 Ariz. 7, 9, 648 P.2d 122 (1982); *In re Martin,* 58 Cal. 2d 509, 512, 24 Cal. Rptr. 833, 374 P.2d 801 (1962); *State v. Munsey,* 152 Me. 198, 201, 127 A.2d 79 (1956); *Brown v. Municipal Court,* 86 Cal. App. 3d 357, 361, 150 Cal. Rptr. 216 (1978). North Dakota has held that, where there is a full opportunity to obtain

---

[15] *See,* 63 Op. Atty. Gen. 119 (1974), which details some of the practical problems confronting law enforcement agencies by the two-test requirement. We take no position in respect to whether the practical and economic difficulties posed exonerate a police agency in the event of failure to timely furnish a second test.

an independent test at the defendant's own expense, constitutional due process standards are met.[16] *State v. Larson*, 313 N.W.2d 750, 753 (N.D. 1981).

While we adopt the rationale of none of these cases at this time, it is apparent that a common thread runs through all of them—that the right to a timely second test, which *may* provide exculpatory evidence, or at any rate provide evidence material to the defendant's guilt or innocence—supplies an element of due process which may be missing where an alcohol test which is *prima facie* correct cannot be challenged because the chemical or reagents used in the original test cannot be retested. Such is the case in respect to a breathalyzer test where, as the trial court record herein demonstrates, the spent ampoule is useless for retest purposes.

Thus, while the ampoule is not retestable for BAC, a defendant, under the statute, has the right to have a second test at the state's expense or an alternate test to be administered by a qualified person chosen by the defendant at the defendant's expense.

Fitzgerald and Hume, writing in *The Single Chemical Test for Intoxication: A Challenge to Admissibility*, 66 Mass. Law Rev. 23 (1981), raise the question of deprivation of due process when there is the opportunity for but a single test. They state that:

"... a second test, perhaps one-half hour after the first, ought to be required by statute when chemical tests are to be used in criminal cases. In some cases the second test will support the prosecution. In many, the significance of the two tests might still remain ambiguous. In others, the second will be exculpatory, of par-

---

[16] Some of these cases are also intertwined with an alleged sixth amendment right to counsel. The most recent pronouncement of Wisconsin law in that respect appears in *State v. Neitzel*, 95 Wis. 2d 191, 289 N.W.2d 828 (1980).

ticular importance where the single test alone would have been inculpatory." P. 36.[17]

In Wisconsin, the right to a second test is protected by statutory law, and it is, we believe, an assurance of constitutional due process. The second test affords the defendant the opportunity to scrutinize and verify or impeach the results of the breathalyzer test administered by enforcement authorities. Additionally, the legislation requires that an apprehended driver be advised of the absolute right to a second test. This is a legislatively conferred right which we will strictly protect.

In addition, we have referred to that "great engine for the truth," cross-examination and confrontation of the test operator. This is a constitutional right that cannot be denied and which is an additional assurance that due process is afforded when the results of a breathalyzer test are put into evidence by the prosecuting authorities.

The fact that we hold that breath ampoules need not be produced denies a defendant of nothing but an empty and meaningless right to inspect a used device that has no value either as to inculpation or exculpation. The rights of the defendant to due process are, in any event, preserved and the mandates of *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Agurs*, 427 U.S. 97 (1976); and *State v. Amundson*, 69 Wis. 2d 554, 230 N.W.2d 775 (1975), are satisfied. The fact situation in this case and similar cases is different than that of

---

[17] It should be noted that Fitzgerald and Hume are also concerned about the metabolism curve in respect to the suspected drunken driver, *i.e.*, a second test may demonstrate that the BAC is continuing to mount or is declining, thus furnishing proof or disproof of prohibited BAC at the time of the alleged offense. This may be important either as exculpatory or inculpatory evidence, although the test is identical to the original one. Due process is sought to be assured by giving a more appropriate statistical curve to show the BAC at the time of arrest.

either *Brady* or *Agurs*. No evidence has been destroyed or intentionally withheld. Rather, the evidentiary fact gleaned from the test itself, *i.e.*, the breath test result, has consumed the subject of the test, because the breath and the test solution, by the lapse of time, become almost immediately useless. The ampoule thus cannot be a source of material evidence. Yet, a second test, which is afforded an accused by statute, may proivde a result which will furnish evidence that is material to the defendant's guilt or innocence. Due process requires strict adherence to the right to a second test, including positive evidence that a defendant has been advised of the right to an additional test.

We hold that, in the case before us, the record demonstrates the state came forward with credible evidence sufficient for the trial judge to conclude that a used ampoule is incapable of supplying material evidence.[18] Accordingly, the inability of the state to produce the destroyed ampoule did not deprive the defendant of due process. The test results, in the absence of any meaningful challenge—and there is none here—are presumed to be accurate. *State v. Humphrey,* 107 Wis. 2d 107, 111, 318 N.W.2d 386 (1982); *City of New Berlin v. Wertz,* 105 Wis. 2d 670, 674, 314 N.W.2d 911 (Ct. App. 1981); *State v. Neitzel,* 95 Wis. 2d 191, 203, 289 N.W.2d 828 (1980); *Suspension of Operating Privilege of Bard-*

---

[18] *California v. Trombetta,* —— U.S. —— (June 11, 1984), which was mandated subsequent to this court's consideration of this case and the preparation of this opinion, is supportive of the general propositions contained herein. Importantly, it points out the state has no responsibility to preserve evidence for a defendant unless the evidence possesses an exculpatory value that was apparent before it was destroyed and which might be expected to play a significant role in the suspect's defense. It also emphasizes the role played by a defendant's access to "comparable evidence by other reasonably available means." Slip Opinion at 9.

*well,* 83 Wis. 2d 891, 900, 266 N.W.2d 618 (1978) ; *State v. Trailer Service, Inc.,* 61 Wis. 2d 400, 407–08, 212 N.W.2d 683 (1973). The breathalyzer test results are not to be suppressed. Accordingly, the conviction based on the plea of no contest is affirmed.

*By the Court.*—Judgment affirmed.

SHIRLEY S. ABRAHAMSON, J. (concurring). I concur in the holding of the court. On the basis of the evidence presented in this case, I too would affirm the circuit court's order denying suppression of the test results. The defendant's federal constitutional rights have not been violated. "The constitutional duty of the States to preserve evidence is limited to evidence that might be expected to play a role in the suspect's defense." *California v. Trombetta,* —— U.S. ——, —— (LEXIS slip opinion, p. 2) (June 11, 1984.) No argument has been made that the Wisconsin constitution requires the state to preserve evidence that cannot be expected to play a role in the suspect's defense.

I do not join the dictum of the opinion relating to sec. 343.305 (10) (d), Stats. 1981–82, which was adopted after this case arose. The legislature's decision to codify the holding in the *Booth* case is not necessarily negated by this court's decision in this case. The legislature may find merit in the position taken by the experts in the *Booth* case and by the defendant's expert in this case. The legislature may adopt more rigorous safeguards governing the state's preservation of breathalyzer ampoules than those imposed by the federal or state constitution. *California v. Trombetta,* —— U.S. ——, —— (LEXIS slip opinion, p. 9, note 12) (June 11, 1984).